1  THOMAS R. BURKE (State Bar No. 141930)
   DAVIS WRIGHT TREMAINE LLP
2  One Embarcadero Center, Suite 600
   San Francisco, California  94111-3611
3  Telephone:  (415) 276-6500
   Facsimile:  (415) 276-6599
4
   ALAN L. SCHLOSSER (State Bar No. 49957)
5  AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION OF NORTHERN CALIFORNIA
6  1663 Mission Street, Suite 460
   San Francisco, California 94103
7  Telephone:  (415) 621-2493
   Facsimile:   (415) 255-8437
8
   Attorneys for Plaintiffs Rebecca Allison Gordon,
9  Janet Amelia Adams, and American Civil Liberties
   Union Foundation of Northern California
10
                    UNITED STATES DISTRICT COURT
11
             FOR THE NORTHERN DISTRICT OF CALIFORNIA
12
                       SAN FRANCISCO DIVISION
13

14  REBECCA ALLISON GORDON, JANET          ) No.  C-03-1779 CRB
    AMELIA ADAMS, and AMERICAN CIVIL       )
15  LIBERTIES UNION FOUNDATION OF          ) **PLAINTIFFS' SECOND OMNIBUS**
    NORTHERN CALIFORNIA,                   ) **MEMORANDUM OF POINTS AND**
16                                         ) **AUTHORITIES IN SUPPORT OF**
                          Plaintiffs,      ) **MOTION FOR SUMMARY JUDGMENT**
17         v.                              ) **AND IN OPPOSITION TO**
                                           ) **DEFENDANTS' MOTION FOR**
18  FEDERAL BUREAU OF INVESTIGATION,       ) **SUMMARY JUDGMENT**
    TRANSPORTATION SECURITY                )
19  ADMINISTRATION, and DEPARTMENT OF      ) Hearing:  December 17, 2004
    JUSTICE                                ) Time:       10:00 a.m.
20                        Defendants.      )
                                           ) **HON. CHARLES R. BREYER**
21  _____

22

23

24

25

26

27

28

## I.   INTRODUCTION

Plaintiffs Rebecca Allison Gordon and Janet Amelia Adams ("Plaintiffs") first made their FOIA and Privacy Act requests two years ago in December of 2002.  In response, the Transportation Security Administration ("TSA") all but ignored Plaintiffs' FOIA and Privacy Act requests.  Declaration of Jayashri Srikantiah ("Srikantiah Decl."), Exhs. E & H.[1]  Indeed, the TSA began to publicly acknowledge the existence of a "no fly" list only *after* this lawsuit was filed.  When the FBI *twice* denied that it had *any* responsive documents, see Srikantiah Decl. ¶¶ 7, 9; Exhs. E & G, Plaintiffs were left with no choice but to file this lawsuit to learn why they and others were stopped and questioned by law enforcement officials because of the government's use of the "no fly" list, and to compel the government to explain how the names on the "no fly" list are compiled and how innocent individuals who are stopped can get their name off of the government's "no fly" list.  Importantly, Plaintiffs also sought to learn whether First Amendment protected activities (such as those regularly exercised by Plaintiffs) is a reason for being included on the government's "no fly" list.  More than two years later, Ms. Gordon and Ms. Adams – committed peace activists but indisputably not a threat to aviation security – still await answers from their government.

On June 15, 2004, this Court issued an interim order that compelled the government to release a variety of documents concerning the "no fly" list that were sought by Plaintiffs.  In some cases in direct contravention of portions of this Court's order, the government continues to keep secret a number of documents and information based on a variety of FOIA exemptions that it cannot legally justify.  In what is now its <u>third</u> attempt at providing declarations, the government again offers merely conclusions and speculation regarding suspected harms that will flow from disclosure of the information in the documents it continues to withhold.  It has again provided no real assurances that its search for the records sought by Plaintiffs is complete.  It has also again failed to satisfy its obligation to show that non-exempt materials have been properly segregated from withheld information and documents –

---

[1]      Throughout this memorandum, Plaintiffs refer to the declarations previously filed by Plaintiffs and Defendants in support of their respective first motions for summary judgment.  10/08/04 Order ("The parties may rely upon memoranda, declarations and exhibits previously filed with the Court to the extent appropriate.")  However, the TSA and FBI documents referenced in this memorandum almost always refer to the most recent versions of those documents, as filed by the government on October 7, 2004.

1  effectively preventing Plaintiffs from meaningfully challenging its withholding decisions.

2      The government's second motion for summary judgment should be denied because it has

3  improperly withheld information under Exemptions 2, 3, 5, 6 and 7 of FOIA based on its repeated

4  failure to adequately describe withheld information as required by FOIA.  In addition, the government

5  has failed to provide an appropriate response to Plaintiffs' Privacy Act requests.  Because the

6  government has failed to meet its burdens, the government's second summary judgment motion should

7  be denied, and Plaintiffs' motion for summary judgment should be granted.

8                    **II.    FACTUAL BACKGROUND**

9  **A.    The Plaintiffs in This FOIA and Privacy Act Lawsuit**

10      Plaintiff Rebecca Allison Gordon is a U.S. citizen and a resident of San Francisco, California.

11  Ms. Gordon is a long-time activist for peace and civil rights.  She is currently a graduate theology

12  student at the Starr King School for the Ministry in Berkeley, California.  She is also a writer and a co-

13  publisher of *War Times*, a newspaper that first began publication after September 11, 2001.  From its

14  inception, *War Times* has published articles and commentary critical of the Bush Administration's

15  restrictions on civil liberties as part of its domestic "war on terrorism."  See Plaintiffs' Complaint ¶ 6.

16      Plaintiff Janet Amelia Adams is also a U.S. citizen and a resident of San Francisco, California.

17  She works as a consultant assisting advocacy groups and progressive political candidates with strategic

18  planning.  Like Ms. Gordon, Ms. Adams is a long-time activist for peace, a community organizer and a

19  co-publisher of *War Times*.  She has also been an outspoken critic of the Bush Administration's anti-

20  civil liberties policies, and has authored articles opposing the Administration's war against Iraq.  See

21  Plaintiffs' Complaint ¶ 7.

22      Plaintiff ACLU-NC is a nonprofit public interest organization working to increase citizenship

23  participation in governance issues.  The ACLU-NC, an affiliate of the national American Civil Liberties

24  Union, was founded in 1934 and has over 32,000 members.  The ACLU-NC routinely publishes

25  periodicals, news briefings, right-to-know documents, and other materials that are disseminated widely

26  to the public.  The ACLU-NC also disseminates information through its website (www.aclunc.org),

27  which addresses civil liberties issues in depth, provides features on civil liberties issues in the news,

28  and contains numerous documents that relate to the issues on which the ACLU-NC is focused.  The

2

1   ACLU-NC further disseminates information through a newsletter that has been in operation since 1936,

2   and that is distributed bi-monthly to over 30,000 households in Northern California.  <u>See</u> Srikantiah

3   Decl. ¶¶ 2-3.

4   **B.  Law Enforcement Officials Detain Plaintiffs Gordon and Adams at SFO Based on "No Fly"**
5       **List**

6          On August 7, 2002, Plaintiffs Gordon and Adams arrived at SFO for an American Trans Air

7   flight to Boston via Chicago.  When they checked in for their flight at the ATA counter, an ATA agent

8   told them that their names appeared on a "no fly" list.  San Francisco Police Department officers arrived

9   at the scene and detained Plaintiffs Gordon and Adams. The officers informed them that the police

10  would have to check whether their names appeared on a "master list."  Although Gordon and Adams

11  were permitted to fly, their boarding passes were marked with a red "S," which subjected them to

12  additional searches at SFO.  Plaintiff Adams was again subjected to additional searches at Logan

13  International Airport in Boston during her return flight to SFO.  <u>See</u> Plaintiffs' Complaint ¶ 11.

14  **C.  Public Records Released by SFO Confirm Use of "No Fly" List**

15         In response to the August 7th incident, Plaintiff ACLU-NC, on behalf of Gordon and Adams,

16  sent a letter to SFO on November 14, 2002, requesting records about the incident and the "no fly" list

17  under the California Public Records Act.  <u>See</u> Srikantiah Decl. ¶ 4; Exh. A.  John L. Martin, SFO's

18  Airport Director, responded on November 22, 2001 and provided documentation confirming the

19  existence of a "no fly" list used by the FBI.  <u>See</u> Srikantiah Decl. ¶ 5; Exhs. B & C.  This documentation

20  also confirmed that on August 7, 2002, law enforcement authorities checked Plaintiffs Gordon and

21  Adams' names against a master "FBI list."  <u>Id.</u>

22  **D.  Plaintiffs' December 12, 2002 FOIA Requests to the FBI and TSA**

23         On December 12, 2002, Plaintiff ACLU-NC, on behalf of Plaintiffs Gordon and Adams and the

24  ACLU-NC, sent letters to the FBI (to its San Francisco office and Washington, D.C. headquarters) and

25  to TSA (in Washington, D.C.).  <u>See</u> Srikantiah Decl. ¶ 6; Exh. D.  Through this correspondence,

26  Plaintiffs sought the disclosure of the following records under FOIA:

27         a.      All records prepared, collected, or maintained by the FBI, TSA, and/or
                   Department of Transportation ("DOT") in connection with the placement of
28                 Ms. Gordon's or Ms. Adams' name or other identifying information on any lists

3

of individuals considered potential threats to transportation or national security, including lists maintained pursuant to the Aviation Transportation Security Act of 2001 (hereinafter "watchlists").

b.     All records prepared, collected, and/or maintained by FBI, DOT and/or TSA about the placement of Ms. Gordon's or Ms. Adams' name or identifying information on the list commonly referred to as the "no fly" list.

c.     All records, including memoranda of understanding and correspondence, transmitted between DOT, TSA, and/or the FBI and any airport or local police department, including SFO and SFPD, regarding sharing or gathering information related to a "no fly" list or any watchlist.

d.     All records, including memoranda, policy directives, and guidances, issued by FBI, DOT, and/or TSA and distributed to any airport or local police department, including SFO or SFPD, regarding the "no fly" list or any watchlist.

e.     All records, including policy directives, procedures, and guidances, regarding access to the "no fly" list and any watchlists by any individual or agency, including airline or airport employees.

f.     All records, including policy directives, procedures, and guidances, concerning how individuals are placed on and removed from the "no fly" list or any watchlist.

g.     All records, including, policy directives, procedures, and guidances, regarding whether political beliefs, membership in groups, or any other First Amendment activity is a factor in placing individuals on the "no fly" list or any watchlist.

h.     All records, including policies, procedures, guidances, and evaluations, regarding the use and accuracy of the "no fly" list or any watchlist and any procedures to correct errors or remove names from those lists.

i.     All files and records maintained by the FBI, DOT and/or TSA indexed or maintained under the name or identifying information of Plaintiff Adams.

j.     All files and records maintained by the FBI, DOT and/or TSA indexed or maintained under the name or identifying information of Plaintiff Gordon.

k.     Agency records containing information about the number of names on the "no fly" list and all watchlists as of the date of this request.

l.     Agency records containing information about the number of times since the creation of the "no fly" list and effective date of the Aviation Transportation Security Act (ATSA) that the DOT, TSA, FBI, or local or state law enforcement. including SFPD, has stopped or questioned individuals at airports, including SFO, because those individuals were believed to be on the "no fly" list or any watchlist.

m.     Agency records containing information about the number of times since the creation of the "no fly" list or the ATSA's effective date that an individual was incorrectly identified (even briefly) as being on the "no fly" list or any watchlist.

n.     Agency records containing information about the name(s) of the agency or agencies that maintain(s) the "no fly" list or any watchlist.

**E.      FBI Responds That It Has "No Records" Responsive to Plaintiffs' FOIA Requests**

On December 19, 2002, the FBI's San Francisco office notified Plaintiffs that the FBI had located "no records" regarding Plaintiffs Gordon and Adams individually, or otherwise responsive to Plaintiffs' December 12th requests.  The FBI referred Plaintiffs' requests to the FBI's Washington, D.C. office.  See Srikantiah Decl. ¶ 7; Exh. E.  In January of 2003, Plaintiffs were notified that FBI headquarters had located "no records" responsive to their December 12th requests.  See Srikantiah Decl. ¶ 9; Exh. G.

In response, on February 14, 2003, through counsel, Plaintiffs sent a certified letter to the FBI appealing the FBI San Francisco office's denial of their FOIA and Privacy Act requests.  In this correspondence, Plaintiffs observed that the FBI's blanket "no records" response seemingly ignored "the full scope" of the FOIA requests which expressly sought agency records "regarding the existence of any 'no fly' list or 'any watchlist" as well as 'policy directives, procedures and guidances' concerning how individuals who are placed may be removed from the 'no fly' list or any watchlist' among other documents."  See Declaration of Thomas R. Burke ("Burke Decl.") ¶ 2; Exh. A.

On March 5, 2003, through counsel, Plaintiffs sent certified letters to the FBI appealing the FBI Washington, D.C. headquarters' denial of their FOIA and Privacy Act requests.  Again, Plaintiffs reiterated their position that the FBI's blanket "no records" response seemingly ignored "the full scope" of the Plaintiffs' FOIA requests.  See Srikantiah Decl. ¶ 11; Exh. I.[2]

**F.      TSA Denies Plaintiff ACLU-NC's Fee Waiver Denial; ACLU-NC Appeals**

On March 21, 2003, through counsel, Plaintiff ACLU-NC sent letters to TSA appealing a determination by the agency that Plaintiff ACLU-NC did not have the right to obtain a fee waiver.  See Burke Decl. ¶ 3; Exh. B; Srikantiah Decl. ¶ 11; Exh. J.  This letter was in response to a TSA letter sent on February 21, 2003, in which the agency denied Plaintiff ACLU-NC's request to be granted status as a representative of the news media for purposes of waiving search and review fees.  See Srikantiah Decl. ¶ 10; Exh. H.

Although the agency was prepared to deny Plaintiff ACLU-NC's fee waiver, at that point, TSA

---

[2]      On March 28 and April 3, 2003, respectively, Defendant FBI acknowledged receipt of Plaintiffs' appeal letters regarding the denials by the agency's San Francisco office and its headquarters.  See Burke Decl. ¶ 4; Exh. C; Srikantiah Decl. ¶ 12; Exh. K.

1   had otherwise failed to respond substantively to Plaintiffs' December 12th FOIA requests.  See Burke

2   Decl. ¶ 8; Exh. F.[3]  In its appeal to TSA, Plaintiff ACLU-NC clarified that it "qualifies as a news media

3   representative because it disseminates information to the public through its periodic newsletter,

4   published reports, web site, news conferences and interviews," and provided detailed support for this

5   contention.  See Srikantiah Decl. ¶¶ 1-3; Exh. B.  By a separate letter, also sent via facsimile and U.S.

6   mail on March 21, 2003, Plaintiff ACLU-NC also provided clarification, in response to TSA's request,

7   as to why Plaintiff ACLU-NC qualified for a waiver of duplication costs because disclosure of the

8   information sought by Plaintiffs' requests is in the public interest.  See Srikantiah Decl. ¶ 11; Exh. J.

9   **G.      The Government's Use of "No Fly" Lists Is Widely Reported in the Media**

10          Both before and after the filing of this lawsuit, the government's use of the "no fly" list and other

11  watchlists as well as the public's concern about such lists has been chronicled in a variety of

12  publications and other media.  See, e.g., Ryan O'Rourke, "Activists Detained; Government Afraid of

13  Those Who Disagree," *Milwaukee Journal Sentinel* (Apr. 26, 2002); Ralph R. Ortega, "He's Told Name

14  Just Won't Fly," *New York Daily News* (May 21, 2002); Matthew Rothchild, "The No Fly List; People

15  in the U.S. Who Are Considered Security Risks Are Not Allowed Normal Access to Air Travel,"

16  *The Progressive* (Jun. 1, 2002); Sean Holstege, "Some Travelers a Threat to Country in Name Only,"

17  *Oakland Tribune* (Sept. 5, 2002); "Retired Coast Guard Commander Finds Himself on FBI List,"

18  *Associated Press* (Sept. 11, 2002); Alan Gathright, "No-Fly Blacklist Snares Political Activists," *San*

19  *Francisco Chronicle* (Sept. 27, 2002); Editorial, "A 'No-Fly Zone' in Our Country?" *San Francisco*

20  *Chronicle* (Sept. 30, 2002); Bill Whitaker, "Peace Activists Claim the Government Is Treading on Their

21  Civil Rights," *CBS News* (Oct. 6, 2002);Charles Osgood, "Some Activists Names Appear on FBI No-Fly

22  List," *CBS News* (Oct. 7, 2002); Editorial, "Common Sense Checks In," *Baltimore Sun* (Oct. 8, 2002);

23  Steve Jacob, "Vacation Interrupted," *Forth Worth Star-Telegram* (Oct. 11, 2002); Bob Egelko,

24

---

25  [3]      While the TSA denied Plaintiff ACLU-NC's fee waiver and otherwise remained silent in
    response to Plaintiffs' FOIA requests, nevertheless the agency in a January 17, 2003 letter sent by
26  Michael D. Robinson, Associate Under Secretary for Aviation Security Operations of the TSA in
    Washington, D.C. to Mr. and Mrs. Dennis Musante of Alamo, California, conceded that it "does require
27  each airline to use a 'Watchlist' comprised of names provide by Federal law enforcement agencies.
    When an airline has a reservation with a passenger name that matches or is similar to one on the
28  'Watchlist' the airline must follow certain established procedures to clear the individual."  Srikantiah
    Decl. ¶ 13, Exh. M.

1  "ACLU's TV Ads Make Issue of Bush Security Measures," *San Francisco Chronicle* (Oct. 17, 2002);

2  Jack Chang, "Liberties Tested After September 11," *Contra Costa Times* (Nov. 14, 2002); Dave

3  Lindorff, "Grounded: A Federal Agency Confirms That it Maintains an Air Travel Blacklist of 1,000

4  People," *salon.com* (Nov. 15, 2002); Ann Davis, "Post-Sept. 11 Watch List Acquires Life of Its Own,"

5  *Wall Street Journal* (Nov. 19, 2002); Ann Davis, "Lists That Bar Air Passengers Draw Scrutiny," *Wall*

6  *Street Journal* (Dec. 12, 2002); Alan Gathright, "ACLU Seeks Answers to 'No-Fly' Lists," *San*

7  *Francisco Chronicle* (Dec. 13, 2002); Dave Lindorff, "The Government's No Fly Blacklist," *The New*

8  *Haven Advocate* (Dec. 19, 2002); Robyn Blumner, "If Your Name Gets on the Wrong List, You're in

9  Trouble," *St. Petersburg Times* (Dec. 22, 2002); Robyn Blumner, "So You Want to Get Your Name Off

10  That List . . .?" *The Milwaukee Journal Sentinel* (Dec. 23, 2002); Dave Lindorff, "The No-Fly List; Is

11  a Federal Agency Systematically Harassing Travelers for Their Political Beliefs?" *In These Times*

12  (Dec. 23, 2002); Ira Berkow, "Rower with Muslim Name Is an All-American Suspect," *New York Times*

13  (Feb. 21, 2003); Alan Gathright, "U.S. Evolving into Big Brother Society, ACLU Says," *San Francisco*

14  *Chronicle* (Jan. 16, 2003); "ACLU Seeks Government Data Regarding Secret 'No-Fly List," *The*

15  *Associated Press* (April 22, 2003); "Civil Liberties:  ACLU Demands More Information on No Fly

16  List," *National Journal* (April 23, 2003); "This List Doesn't Fly," *St. Petersburg Times* (May 16, 2003);

17  "Airlines Security System Flags David Nelsons," *The Associated Press*, (June 15, 2003); "TSA Offers

18  'Real Solutions,'" *USA Today* (June 25, 2003); "Feds Don't Track Airline Watchlist Mishaps," *The*

19  *Associated Press* (July 24, 2003); "Two on 'No-Fly' List Arrested at Airport," *The Washington Post*

20  (August 14, 2003); "Arrests of 2 Pakistanis at Airport Trigger Probe," *The Houston Chronicle*

21  (August 14, 2003); "SEA-TAC Terror Alarm Over 2 Pakistanis May Have Been Misguided,"

22  *The Seattle-Post Intelligencer* (August 22, 2003); "No-Fly List May Keep You Grounded," *Scripps-*

23  *Howard News Service* (December 10, 2003); "College Student Files Federal Lawsuit Over 'No-Fly'

24  List," *The Associated Press* (January 1, 2004); "No Fly? No Way, Not Me, She Says," *Pittsburgh Post-*

25  *Gazette* (January 2, 2004); "Student Who Sued Over 'No-Fly' List Cleared for Takeoff," *The Associated*

26  *Press* (January 4, 2004); "Passengers Have Trouble Getting on Airplanes Because Their Names Are

27  Similar to Those on Government No-Fly List," *NBC Nightly News* (January 11, 2004); "No Fly List

28  Leaves Co-Defendant Grounded," *The Tampa Tribune* (January 23, 2004); "U.S. Terror Watch List

7

1   Keeps Eye on  All Groups," *The Washington Times* (February 22, 2004); Burke Decl. ¶ 5; Exh. D.  In

2   letters written to their Senators and Representatives, dozens of air passengers across the country have

3   complained about their experiences with the "no fly" list.  See

4   www.epic.org/privacy/airtravel/foia/watchlist_foia_analysis.html (providing links to letters of air

5   travelers) (link active as of 11/29/04).

6           Following this Court's June 15th Order, the federal government's "no fly" list has been the

7   subject of even greater media coverage, particularly in light of the experiences of U.S. Senator Edward

8   M.  Kennedy of Massachusetts, U.S. Representative John W. Lewis of Georgia and Yusuf Islam,

9   formerly known as "Cat Stevens," whose names were reportedly either on or were similar to names

10  appearing on the list.  See e.g., "Dominate. Intimidate. Control: The Sorry Record of the Transportation

11  Security Administration," by James Bovard, *Reasononline*, February 2004; "Innocent Trip Marred by a

12  Name," by Yasmin Anwar, *HonoluluAdvertiser.com*; "U.S. Rights Group Challenges Airline Security

13  Effort," by Andrew Tully, *Radio Free Europe/Radio Liberty*, April 7, 2004; "No Fly List Traps

14  Innocent," *Los Angeles Times*, April 14, 2004; "Piecemeal Watch List," by Karen D. Schwartz,

15  *GOVEXEC.com*, June 1, 2004; "Feds Stonewalling ACLU Over No-Fly List, Federal Judge Says,"

16  *Associated Press*, June 16, 2004; "No-fly List is a Hassle for Passenger with Common Name," by

17  Marjie Lundstrom, *Sacramento Bee*, July 24, 2004; "Are We Safer?," *Pbs.org*, *NewsHour*, August 16,

18  2004; "U.S. Watchlist Monitoring Proposed as Son of CAPPS II," *Privacy International.org*, August 17,

19  2004; "You, Too, Could Be a Suspected Terrorist," by Anthony D. Romero, August 17, 2004; "Clerical

20  Error Puts Senator on 'No Fly' List," *CBS News and Associated Press*, August 19, 2004; "Ted

21  Kennedy's Airport Adventure," *CBS News and Associated Press*, August 19, 2004; "Database Snafu

22  Puts U.S. Senator on Terror Watch List," by Thomas C. Greene, *The Register*, August 19, 2004; "Terror

23  No-Fly List Singled Out Kennedy: Senator Was Stopped 5 Times at Airports," by Sara Kehaulani Goo,

24  *Washington Post*, August 20, 2004; "Error Puts Kennedy on Airline No-Fly List," *Associated Press*,

25  August 20, 2004; "Kennedy Has Company on Airline Watch List," *CNN.com*, August 20, 2004; "No-

26  Fly List Almost Grounded Kennedy, He Tells Hearing," by Charlie Savage, *Boston Globe*, August 20,

27  2004; "Senator? Terrorist? A Watch List Stops Ted Kennedy at Airport," by Rachel L. Swarns, *The New

28  York Times*, August 20, 2004; "How Not to Fight Against Terrorism," by Ann McFeathers, *Cincinnati*

Post, August 21, 2004; "Hundreds Report Watch-List Trials: Some Ended Hassles at Airports by Making Slight Change to Name," by Sara Kehaulani Goo, *Washington Post*, August 21, 2004; "Why Was Senator Kennedy Placed on U.S. 'No-Fly' List?," by David Walsh and Barry Grey, *The World Socialist Web Site*, August 21, 2004; "U.S. Congressman in Security Watch List?" *The Times of India*, August 21, 2004; "This Security List Isn't Going to Fly," *The Daily News* (Jacksonville, Florida), August 21, 2004; "Terror Watch Lists Are Tough to Escape," by Lolita C. Baldor, *Associated Press*, August 22, 2004; "New Blacklist, Same Old Dangers" by Robyn E. Blumner, *St. Petersburg Times*, August 22, 2004; "The Bro-Ha-Ha Over Ted Kennedy on the No-Fly List," *The Command Post*, August 23, 2004; "No-Fly List Goes Too Far," *Contra Costa Times*, August 25, 2004; "TSA to Test New Passenger Pre-Screening System," *Findbiometrics.com*, August 26, 2004; "Latest Flight Screening Reviewed," by Shaun Waterman, *UPI, The Washington Times*; "TSA Offers New Program to Identify Airline Passengers," by Michael Pastore, *insideid.com*, August 30, 2004; "'No-Fly' List Infringes on Personal Freedoms," by Stephanie Young, *The Temple News*, September 14, 2004; "Cat Stevens Fever & Islam," by Gary Fitleberg, *OpinionEditorials.com*, September 20, 2004; "Ex-Pop Singer Held After D.C. Flight Diverted," by Sara Kehaulani Goo, *ReligionNewsBlog.com*, September 22, 2004; "Yusuf Islam Denied U.S. Entry," *Aljazeera.net*, September 22, 2004; "Feds Probe 'Watchlist' Breakdown," *Executive Travel Associates*, September 23, 2004; "U.S. Urges Changes in Watch List Rules," by Leslie Miller, *Associated Press*, September 23, 2004; "Report: 'No-Fly' List is Still Lacking – Three Years After 9/11, There Is No Single Terrorism Watch List," by Lisa Myers, *NBC*, September 23, 2004; "Singer's Donations Landed Him On Watch List," *Maine News*, September 23, 2004; "Cat Stevens Banished as Terror Threat," by Richard Sisk, *New York Daily News*, September 23, 2004; "We're Protected From Cat Stevens," *The Plain Dealer*, September 24, 2004; "You Say Yusuf, I Say Youssouf. . . The Cat Stevens Incident Has Its Origins In A Spelling Mistake," by Sally B. Donnelly, *Time Online Edition*, September 25, 2004; "Moonshadow Boxing," *Washingtonpost.com*, September 26, 2004; "I'm Being Followed by a Moons-Shadow Government," by Dave Tomar, *The Outside* World, September 27, 2004; "Cat Stevens Says He Was Profiling Victim," *Associated Press*, September 28, 2004; "Cat Stevens to Take Legal Action in Wake of Mistaken Deportation," *Associated Press*, September 28, 2004; "Finally, The Cat May Be Outta the Bag," by Michael Smerconish, *philly.com*, September 30,

9

2004; "Rep. Young Becomes Latest Victim of No-Fly List: Young's Committee OKs Bill Giving the Government Task of Checking Names," by Leslie Miller, *Associated Press*, *Juneau Empire State News Online*, September 30, 2004; "Committee Chairman Runs Into Watch-List Problem: Name Similarity Led to Questioning at Anchorage and Seattle Airports, Alaska Congressman Says," by Sara Kehaulani Goo, *Washingtonpost.com*, September 30, 2004; "Loose Cannon: Threat Level: Leafy Green" by Richard H. Levey, *Direct Marketing Business Intelligence*, October 1, 2004; "DHS is Failing to Lead Watch-List Integration, IG Says" by Katherine McIntire Peters, *GOVEXEC.com*, October 1, 2004; "The No-Fault No-Fly List: Washington's Most Irresponsible Agency Strikes Again," by James Bovard, *The Future of Freedom Foundation*, October 8, 2004; "U.S. No-Fly List Has Grown to Include Thousands" by Eric Lichtblau, *New York Times*, October 9, 2004; "Faulty 'No-Fly' System Detailed," by Sara Kehaulani Goo, *Washington Post*, October 9, 2004; "Review: 'No-Fly List' Lacks Rules, Procedures: Watch List Meant to Stop Terrorists From Flying is Under Scrutiny," *CNN*, October 10, 2004; "Unfriendly Skies: Government No-Fly Lists Are Sweeping Up More Than Just Potential Terrorists," *San Francisco Bay Guardian*, Oct. 20 – 26, 2004; "20,000 Put on Government 'No-Fly' Lists," by Jarret Wollstein, *Towards Liberty – A Commentary on Current Events*, October 31, 2004; "Getting Off a Security Watch List is the Hard Part," by Christopher Elliott, *Newyorktimes.com*, November 2, 2004; "Judge To Rule In Few Weeks On 'No-Fly' Lawsuit," by KOMO Staff, *KOMO TV,* November 4, 2004; "Lawsuit Challenges Administration of 'No-Fly' List*," USA Today*, November 5, 2004; "Government Orders Airlines to Turn Over Passenger Data," *Associated Press, Tribune-Review*, November 13, 2004; "The Arrival of Secret Law," *Secrecy News, From the FAS Project on Government Secrecy*, November 14, 2004; "Who Is Steering the 'No-Fly' List?," by Annie Jacobsen, *Womenswallstreet.com,* November 16, 2004; "Passenger Screening Prompts Legal Concern," by Leslie Miller, *Associated Press*, November 19, 2004; "U.S. Deports Airline Passenger On No-Fly List" by Audrey Hudson, *The Washington Times*, November 23, 2004.  See Declaration of Thomas R. Burke in Support of Plaintiffs' Second Omnibus Opposition and Motion for Summary Judgment ("12/1/04 Burke Decl.), ¶ 2; Exh. A.

**H.    Public Documents from SFO Show Hundreds of Travelers Detained Using the "No Fly" List**

On April 8, 2003, SFO officials released, in response to a request under the California Public

1  Records Act and the San Francisco Sunshine Ordinance, nearly 400 pages of incident reports

2  documenting instances in which air passengers were stopped or questioned at SFO in connection with

3  the "no fly" list and other watchlists during a six-month period.  In the overwhelming majority of these

4  instances, passengers were erroneously stopped and their names were found not to match the "no fly" or

5  any other watchlist.  See Srikantiah Decl. ¶ 5; Exhs. B & C.

6  ## III.   PROCEDURAL HISTORY

7  This lawsuit was filed on April 22, 2003.  At the initial Case Management Conference on

8  July 25, 2003, counsel for the FBI indicated that the agency would be filing a motion to stay to allow the

9  agency more time to respond to Plaintiffs' FOIA and Privacy Act requests.  The Court allowed the FBI

10  several additional months to locate and review records with the understanding that the FBI would

11  explain what it had been doing during this time.

12  On November 21, 2003, after failing to release any documents in response to Plaintiffs'

13  December 12, 2003 record requests, explain what it did with the additional months it received, or file its

14  anticipated motion to stay, the government appeared at a hearing before the Court.  Counsel for the FBI

15  informed the Court that the agency's documents were "in the mail."  In response, the Court ordered

16  counsel for the parties to meet and confer regarding the adequacy of the FBI's document production and

17  to appear for a further hearing three days later on November 24th.

18  Pursuant to an order issued by this Court on April 1, on April 7, 2004, the government filed with

19  the Court, a complete set of the unredacted copies of the non-classified documents at issue in this

20  litigation.

21  On June 15, 2004, based on its preliminary review of the government's documents, this Court

22  issued an order in which it observed that, "it appears that the government has not met its burden in many

23  instances; instead, the government has applied the exemptions broadly and without providing a detailed

24  explanation of why the withheld material is exempt."  Order at 2.   This Court ordered Defendants to

25  "review all of the withheld material to determine whether they believe in good faith that the material is

26  in fact exempt and, if defendants contend it is exempt, to provide a detailed affidavit that explains why

27  the particular information is exempt."  Order at 7.

28  In response to the "further production" contemplated by this Court in its June 15th Order [see

1   Order at 7], on October 7, 2004, Defendant FBI released eleven additional pages of documents in their

2   entirety and additional portions of most of the remaining previously withheld documents.  See FBI's

3   10/07/04 Notice of Filing (attaching documents released pursuant to 6/15/04 Order).  Defendant TSA

4   released six additional pages in their entirety and additional portions of most of the remaining

5   documents.  See TSA's 10/07/04 Notice of Filing.

6                                                    **IV.**

7                               **THE GOVERNMENT'S BURDENS AND**

8                          **THIS COURT'S *IN CAMERA REVIEW* PROCESS**

9            Under FOIA, individuals have a judicially-enforceable right of access to government agency

10  records.  5 U.S.C. § 552; Lion Raisins Inc. v. United States Dept. of Agriculture, 354 F.3d 1072, 1079,

11  1084 (9th Cir. 2004) (reversing district court's summary judgment in part, because of government's

12  failure to submit "detailed public declarations").  The disclosure provisions of FOIA are to be broadly

13  construed, reflecting the Act's "philosophy of full agency disclosure."  John Doe Agency v. John Doe

14  Corp., 493 U.S. 146, 152 (1989).  Statutory exemptions asserted by the government "must be narrowly

15  construed."  Id.  When the government withholds documents based on one of FOIA's nine statutory

16  exemptions (see 5 U.S.C. § 552(b)(1)-(9)), "the burden is on the agency to sustain its action."  5 U.S.C.

17  § 552(a)(4)(B).

18           On summary judgment, the agency bears the burden of showing that each document is exempt

19  from FOIA's inspection requirements.  See Bay Area Lawyers Alliance for Nuclear Arms Control, 818

20  F. Supp. 1291, 1295 (N.D. Cal. 1992) ("BALA"); PHE, Inc. v. Department of Justice, 983 F.2d 248, 250

21  (D.C. Cir. 1993).  As described in detail below, on its third attempt, the government has again failed to

22  make this showing, and its second motion for summary judgment should accordingly be denied, and

23  Plaintiffs' motion, granted.

24                  **IV.    INFORMATION AT ISSUE IN THIS DISPUTE**

25           The TSA located 161 responsive pages of documents.  The TSA continues to withhold portions

26  of 22 pages of documents that purportedly contain sensitive security information under Exemptions 2

27  and 3, three documents and portions of 10 other documents based on the deliberative process privilege

28  (Exemption 5), and portions of 18 documents under Exemption 6.  See Defendants' Memorandum of

                                                    12

1  Points & Authorities at 8.

2  The FBI located 325 responsive pages of documents.  The FBI continues to withhold portions of

3  12 documents at the request of the TSA, under Exemption 3.  The FBI is also withholding portions of 91

4  documents (along with 18 duplicates) under Exemptions 2 and 7(E), 38 documents (along with 14

5  duplicates) under Exemption 5.  In contrast to the TSA, pursuant to Exemption 7(C), the FBI continues

6  to withhold virtually all of the names of FBI agents, government employees and citizens whose names

7  appear in records maintained by the agency.  See Defendants' Memorandum of Points & Authorities at

8  9-10.

9  Concurrent with the filing of their first summary judgment motion, Plaintiffs withdrew their

10  request for access to security directives, emergency amendments, and the "no fly" list itself.  See e.g.,

11  Riep-Dice Decl., Exh. H, at 14 (referring to 8 Security Directives, 190 "no fly" lists and 166 selectee

12  lists).  Plaintiffs also elected not to challenge the government's withholding of information pursuant to

13  its determination that the withheld information constitutes "sensitive security information" or SSI,

14  except to contest its failure to disclose whether Plaintiffs Gordon and Adams' names appear on the list,

15  and its failure to adequately describe withheld documents and to segregate information that it is required

16  to disclose.[4]  In addition, after the government made a proper showing that the attorney-client privilege

17  applied to specific documents, Plaintiffs agreed not to further challenge any government records where

18  this privilege was properly asserted.[5]  Finally, based on the government's recent showing regarding the

19  protection of confidential sources, Plaintiffs no longer challenge those documents the government

20  maintains are exempt as "confidential sources" under FOIA Exemption 7(D).[6]

21  Accordingly, this memorandum focuses on the remaining documents that continue to be

22  withheld in whole or in part by the government.  As to these documents, Plaintiffs challenge each of the

23  ―――――――――――――――

24  [4]  In spite of this Court's view to the contrary, Defendants continue to withhold certain documents
that appear to reveal, purely statistical information about the use of the "no fly" lists by TSA and FBI.

25  To the extent that such information has not been properly segregated from information withheld as SSI,
it should be immediately disclosed.  See infra at 21-22.

26  [5]  Based on the FBI's recently filed declarations, Plaintiffs withdraw their challenge to the
following documents based on the government's assertion of the attorney-client privilege:  Nos. 31-33,
34-37, 43-44, 45-46, 162, 165, 176, 199 or 246 or the duplicates of these documents, FBI Nos. 159, 164,

27  172, 173-174, 195, 203-204, 227-228, 238, 255 and 264.

28  [6]  See FBI Nos. 38-40, 41-42, 50-51, 53, 141, 148, 152-154, 213-214, 239 and 271-272 along with
duplicates, FBI Nos.  166-168, 169-171, 184, 205-207, 208-210, 211-212, 266-267, 269 and 286.

1  statutory exemptions that the government asserts based on the collection of TSA and FBI documents

2  produced on October 7, 2004, as described in detail below.

3  **VI.    LEGAL ANALYSIS**

4  **A.    As a General Matter, the Government Has Failed to Provide Adequate Detail as to Its Withholding and Segregation Decisions**

5

6  **1.    The Government Fails to Adequately Describe Its Decisions to Withhold Information under Exemptions to FOIA**

7  To justify withholding information under FOIA's exemptions, the government "must provide a

8  relatively detailed justification, specifically identifying the reasons why a particular exemption is

9  relevant and correlating those claims with the particular part of a withheld document to which they

10  apply." BALA, 818 F. Supp. at 1296 (*citing and quoting* King v. U.S. Dept. of Justice, 830 F.2d 210,

11  219 (D.C. Cir. 1987)). The agency must also describe "'each document or portion thereof withheld, and

12  for each withholding it must discuss the consequences of disclosing the sought-after information.'"

13  BALA, 818 F. Supp. at 1296 (*citing and quoting* King, 930 F.2d at 223-224).

14  "The Ninth Circuit has followed other circuits in rejecting the 'categorical' approach of listing

15  the 'types of harms' that generally result when a 'type' of information is disclosed." Id. (*citing* Wiener

16  v. Federal Bureau of Investigation, 943 F.2d 972, 977 (9th Cir. 1991); see also Maricopa Audubon

17  Society v. U.S. Forest Service, 108 F.3d 1089, 1092 (9th Cir. 1997) ("[t]o meet its burden, the agency

18  must offer oral testimony or affidavits that are detailed enough for the district court to make a de novo

19  assessment of the government's claim of exemption.") (citations and quotations omitted); Kamman v.

20  U.S. Internal Revenue Service, 56 F.3d 46, 49 (9th Cir. 1995) (the government must justify its decision

21  to withhold materials through a "reasonably detailed description" of the withheld materials).

22  In Wiener, for example, the Ninth Circuit considered agency affidavits that stated "in general

23  terms why each category of information should be withheld." Id. at 943 F.2d at 978. The proffered

24  *Vaughn* index gave brief descriptions of the withheld information, and provided only boilerplate

25  language corresponding to each type of withheld information. The Ninth Circuit held that such

26  boilerplate language failed to satisfy the requirements of FOIA, recognizing that the "categorical

27  approach affords [plaintiff] . . . little or no opportunity to argue for the release of particular documents,

28  and that "[e]ffective advocacy is possible only if the requester knows the precise basis for

14

nondisclosure." Id. at 979.  The Ninth Circuit then ordered the FBI in that case to revise its *Vaughn*

index, instructing that "[i]n revising the *Vaughn* index on remand, the FBI must bear in mind that the

purpose of the index is not merely to inform the requester of the agency's conclusion that a particular

document is exempt from disclosure under one or more of the statutory exemptions, but to afford the

requester an opportunity to intelligently advocate release of the withheld documents and to afford the

court an opportunity to intelligently judge the contest." Id.; see also PHE, Inc., 983 F.2d at 252

(rejecting affidavits as "too vague and conclusory to support summary judgment"); Campbell v. U.S.

Dept. of Justice, 164 F.3d 20, 30-31 (D.C. Cir. 1998) (rejecting declaration because, among other things,

it failed to draw connection between decision to withhold and national security justification for

withholding); Oglesby v. U.S. Dept. of the Army, 79 F.3d 1172, 1181, 1184 (D.C. Cir. 1996)

(describing remand of CIA declaration for failure to provide detailed justification and rejecting NSA

*Vaughn* affidavits for being "sweeping and conclusory").

In the present case, the government's third set of affidavits continue to fall far short of providing

the required descriptions of withheld documents or the purported harms that might result from

disclosure.  The government continues to offer only boilerplate language.  For example, the FBI's latest

declarant, Keith R. Gehle ("Gehle Decl."), in his 153-page declaration repeats the claim that disclosing

the identity of individuals named in certain of the FBI's documents will "reveal that they are engaged in

counter-terrorism activities on behalf of the TSA and the FBI" and "could subject them to unwanted

attention, unauthorized inquiries or harassment."   Mr. Gehle offers no basis for his concern i.e., how

this "unwanted" attention or "unauthorized inquiries" or "harassment" will take place by simply

releasing individuals' names, let alone provide any quantification of this supposed harm and makes no

attempt to explain how the release of particular documents will affect this "threat." See Id. at p. 41.

Other aspects of the government's latest declarations offer the same kind of vague, speculative  and

wholly conclusory statements that this Court properly rejected earlier this summer.  Accordingly, the

government has for the third and final time, failed to meet its burden for its claimed exemptions.

### 2.     The Government Continues to Inadequately Segregate Information That Should Be Disclosed to Plaintiffs

In addition to providing detailed descriptions of withheld information as well as a description of

15

1   the harm that would result from disclosure, governmental agencies are required to segregate information

2   in responsive documents that is not subject to any exemption.  "[E]ven if part of a document is FOIA

3   exempt, the agency still must disclose any portions which are not exempt – i.e., all 'segregable'

4   information – and must address in its *Vaughn* index why the remaining information is not segregable."

5   BALA, 818 F. Supp. at 1296.

6        District courts considering FOIA cases must then "make specific factual findings on the issue of

7   segregability to establish that the required de novo review of the agency's withholding decision has in

8   fact taken place.  Id. (citing Wiener, 943 F.2d at 988).  "[A]gencies are required to provide the Court

9   with facts which will enable it to make that determination."  Id. at 1300.  "[The] segregability

10  requirement limits claims of exemption to discrete units of information."  Billington v. U.S. Dept. of

11  Justice, 233 F.3d 581, 586 (D.C. Cir. 2000).

12       In direct contravention of this requirement, there is little discussion of segregation of disclosable

13  materials in the government's most recent set of affidavits.  See BALA, 818 F. Supp. at 1296; Wiener,

14  943 F.2d at 988.  Although the government's newest declarants –Gehle and David Graceson ("Graceson

15  Decl.") – refer generally to document redactions, they make no mention of segregating non-exempt from

16  exempt information.  The Declaration of TSA's Catrina Pavlik ("Pavlik Decl.") refers to a "segregability

17  analysis" but offers no meaningful explanation of what the TSA actually did anew to satisfy Plaintiffs'

18  and this Court's concerns.  See Pavlik Decl. at ¶¶ 8, 24.

19       This Court, in its June 15th Order found the government's previous affidavits wanting and

20  specifically observed that the burden of proof  "remains with the agency when it seeks to justify the

21  redaction of identifying information in a particular document as well as when it seeks to withhold an

22  entire document."  Order at 2.  Nevertheless, the government's third round of affidavits fail to correct

23  the insufficiencies of the government's earlier submissions.  In short, none of declarations and

24  supplemental declarations that the government has filed in this case contain language that would enable

25  Plaintiffs or it would appear,[7] even this Court, to determine whether the government has adequately

26  
----

[7]      Plaintiffs obviously, do not have access to the complete Declaration of David Graceson, which
27  was filed under seal, in support of TSA's defense of documents that it represents may be withheld from
     the Plaintiffs and public as Sensitive Security Information ("SSI").  Nevertheless, the wording of the
28  portions of Graceson's declaration that is publicly available suggests that the government is again
     relying on conclusory statements for withholding documents.  See, e.g., Graceson Decl. at ¶ 44

1    segregated withheld information from information that should be disclosed to Plaintiffs.[8]   The

2    government has thus failed to meet its statutory burden.

3    **B.      The Government Is Improperly Withholding Responsive Materials under Exemption 2**
         **(5 U.S.C. § 552(b)(2) – Interagency Records)[9]**
4

5          The government continues to withholding documents and portions of documents under Section

6    552(b)(2) ("Exemption 2") of FOIA on essentially the grounds that disclosure will "impede the

7    effectiveness of the 'no fly list' by revealing the way in which law enforcement entities identify and

8    investigate an individual that is determined to be a risk to aviation security."  Gehle Decl. at ¶ 9.  The

9    government continues to construe Exemption 2 too broadly and provides inadequate factual support for

10   its reliance on this exemption.

11         Exemption 2 permits an agency to withhold only those materials "related solely to the internal

12   personnel rules and practices of an agency."  5 U.S.C. § 552(b)(2).  The "general thrust of exemption 2

13   is simply to relieve agencies of the burden of assembling and maintaining for public inspection matter in

14   which the public could not reasonably be expected to have an interest."  Department of Air Force v.

15   Rose, 425 U.S. 352, 369-370 (1976).  See also Lesar v. U.S. Dep't of Justice, 636 F.2d 472 (D.C. Cir.

---

16   (redacting a single word from TSA No. 11 because "TSA does not want to help terrorists or other
17   malefactors.").

18   [8]      The government also fails to provide the required assurances that it has performed an adequate
     search for potentially responsive documents. See Iturralde v. Comptroller of the Currency, 315 F.3d 311
19   (D.C. Cir. 2003); Campbell, 64 F.3d 20; BALA, 818 F.Supp. 1291.  This omission is particularly
     troubling here, where, among other things:  (a) the government alludes to one police department
20   document about the "no fly" list but not any others, even though the "no fly" list has been distributed to
     airports across the country (see Riep-Dice Decl., Exh. I, at 1 (discussing FBI No. 4); (b) the government
21   provides documentation of ongoing meetings but only provides notes from a few of the meeting dates
     (see TSA 46-60); and (d) the government provides documents referring to meetings with multiple
22   attendees, but makes no showing that it searched the files of the attendees to ensure that all documents
     regarding the meeting were produced (see TSA 46-60); (d) the government fails to provide entire email
23   chains of correspondence (TSA 160-61).  Given these examples, it remains difficult to believe that the
     government's search was adequate as required by FOIA.  See Public Citizen v. Dept. of Education, 292
24   F. Supp.2d 1 (D.D.C. 2003) (requiring search of not only computer files but also paper files); Shrecker
     v. U.S. Dept. of Justice, 254 F.3d 162 (D.C. Cir. 2001) (requiring search for "ticklers" or duplicate
25   documents); Weisberg v. U.S. Dept. of Justice, 705 F.2d 1344 (D.C. Cir. 1983) (describing agency
     justification for search as "inherently unbelievable").  Moreover, the TSA and FBI's third set of
26   affidavits fail to address this issue at all.

27   [9]      Plaintiffs challenge all of the government's decisions to withhold under Exemptions 2, namely as
     to the following documents:  FBI Nos. 1, 4, 14-17, 18-21, 22-23, 25-27, 28, 29, 30, 33, 37-44, 46-52, 61-
28   64, 67-70, 75-76, 84-90, 96-98, 104-105, 116-131, 134-148, 152, 155-157, 162-163, 165, 166-168, 181,
     196, 197, 202, 213, 221, 223-226, 231-237, 239, 240, 244-249, 252, 254, 256, 260-263, 264-265, 287-
     289.

17

1   1980) (Exemption 2 "applies to 'routine matters' of 'merely internal significance' in which the public

2   lacks any substantial or legitimate interest" (citation omitted)); <u>Cox v. U.S. Dept. of Justice</u>, 576 F.2d

3   1302-1310 (8th Cir. 1978) (Exemption 2 exempts only "housekeeping matters").  To qualify under

4   Exemption 2, the materials withheld "must relate not simply to 'agency practices,' but to 'personnel

5   practices' in particular." <u>Maricopa Audubon Society v. U.S. Forest Service</u>, 108 F.3d 1082, 1086 (9th

6   Cir. 1997) (emphasis in original), <i>quoting</i> <u>Audubon Society v. U.S. Forest Service</u>, 104 F.3d 1201, 1203

7   (10th Cir. 1997).  <u>See also</u> <u>Schwaner v. Dept. of the Air Force</u>, 898 F.2d 793, 795 (D.C. Cir. 1990)

8   (withheld materials must relate "predominantly" to internal rules and practices).  The scope of

9   Exemption 2 is thus "narrowly defined and limited." <u>Stern v. Richardson</u>, 367 F. Supp 1316, 1320

10  (D.D.C. 1973) (Exemption 2 held not to prevent disclosure of FBI documents concerning "Cointelpro-

11  New Left" counter intelligence program).  <u>See also</u> <u>Rose</u>, 425 U.S. at 365 ("Congress intended that

12  Exemption 2 be interpreted narrowly and specifically."), <u>quoting</u> <u>Vaughn v. Rosen</u>, 523 F.2d 1136, 1142

13  (D.C. Cir. 1975).

14          Certain law enforcement materials, the disclosure of which would significantly risk

15  circumvention of agency regulation, are exempt from disclosure under Exemption 2 (<u>see</u> <u>Hardy v.</u>

16  <u>Bureau of Alcohol, Tobacco and Firearms</u>, 631 F.2d 653, 657 (9th Cir. 1980)); however, such material

17  may be withheld on "circumvention" grounds only if it meets a two-part test.[10]  First, if the material

18  relates to only trivial administrative matters of no genuine public interest, it may be withheld.  Second, if

19  withholding frustrates a legitimate public interest, the material should be released unless the government

20  can show that disclosure would risk circumvention of agency regulations.  <u>See</u> <u>Founding Church of</u>

21  <u>Scientology of Washington, D.C., Inc. v. Smith</u>, 721 F.2d 828, 831 & n.3 (D.C. Cir. 1983); <u>Crooker v.</u>

22  <u>Bureau of Alcohol, Tobacco and Firearms</u>, 670 F.2d 1051, 1074 (D.C. Cir. 1981).  A reasonably low

---

23          [10]     <u>Hardy</u> on which the government heavily relies, stands for the proposition that only those

24  <i>portions</i> of agency documents that would reveal specific law enforcement techniques and procedures
    may be withheld on circumvention grounds.  <u>Id</u>. at 656-57.  Moreover, the Ninth Circuit has explicitly

25  held that Exemption 2 must be narrowly construed in light of FOIA's dominant objective of disclosure,
    and that in order to fall within its ambit, the withheld material must relate at least predominantly (if not

26  "solely") to internal personnel rules or practices of a government agency.  <u>Maricopa Audubon Society v.</u>
    <u>U.S. Forest Service</u>, 108 F.3d 1082 (9th Cir. 1997) (citing <u>Maricopa Audubon Society v. United States</u>

27  <u>Forest Service</u>, 104 F.3d 2101 (10th Cir. 1997) (materials must relate not simply to agency practices but

28  to "personnel practices" in particular)).

1  threshold is applied for determining when withheld material relates to significant public interests.  See
2  Rose, 425 U.S. at 360-62; Founding Church, 721 F.2d at 831 & n.3.

3       The government cannot legitimately claim that the documents Plaintiffs seek are not of
4  significant public interest.  The government previously conceded that the "no fly" lists have "been the
5  subject of intense media scrutiny."  See Hardy Decl. ¶ 56.   Many of the documents that the government
6  has been forced to release through this litigation as well as literally hundreds of media accounts show
7  that members of the public have expressed that interest on several occasions, including an interest in
8  how individuals erroneously put on the "no fly" lists can get off of the lists, how prominent individuals
9  have encountered difficulties with the lists and whether, as Plaintiffs contend, individuals have been
10  placed on the lists as a result of their First Amendment activities.  See Burke Decl, Exh. D; Declaration
11  of Thomas R. Burke ("12/01/04 Burke Decl.") in Support of Plaintiffs' Second Omnibus Motion at 2 &
12  Exhibits; see also Rose, 425 U.S. at 367-68 (holding that public has an interest in case summaries of Air
13  Force honor and ethics hearings); Katz v. Dept. of Justice, 498 F. Supp. 177, 181 (S.D.N.Y. 1979)
14  (public has "genuine and significant" interest in materials reflecting "how the FBI proceeds in
15  investigating a person allegedly connected with certain organizations"); Ferguson v. Kelley, 448 F.
16  Supp. 919 (N.D. Ill. 1978) (same).

17       Indeed, the effect of the government's use of the "no fly" lists is felt far beyond the agencies
18  themselves, for example, by those individuals detained as a result of erroneously being included on the
19  lists or having a name similar to someone appropriately (or not) on the lists.  See Burke Decl., Exh. D;
20  12/01/04 Burke Decl., attaching exhibits; Srikantiah Decl., Exhs. B & C.  Like Plaintiffs Gordon and
21  Adams, these individuals no doubt fear that, once their name appears on the list, a stigma attaches – e.g.,
22  they are forever more suspected of being a terrorist.  The government, in its first motion for summary
23  judgment, acknowledged this problem.  See Riep-Dice Decl. ¶ 29 ("[S]uch association with a terrorism
24  watchlist could easily be misconstrued by the public and thereby subject these individuals to undue
25  publicity, speculation, harassment and/or embarrassment.").  This concern is repeated in support of the
26  government's second summary judgment motion.  See e.g., Gehle Decl., at p. 153 ("Disclosure of the
27  name of a third party mentioned in records compiled for the purpose of maintaining a 'no fly' List,
28  Selectee List or other terrorism watch list could subject that party to unwanted attention, accusations or

19

1   harassment.")

2       Moreover, the government remains steadfast in its insistence that it can neither "confirm nor

3   deny" if Plaintiffs Gordon and Adams are on the "no fly" list or disclose the criteria for appearing on the

4   "no fly" list or what criteria the government does not use for the list illustrates the Kafka-esque

5   atmosphere that currently  prevails.  See Klasinski Decl. ¶ 21 ("Thus, TSA can neither confirm nor deny

6   that particular names are (or are not) on a TSA No Fly or Selectee list without revealing the very

7   sensitive security information that these provisions are designed to protect.").  More than two years later,

8   Plaintiffs Gordon and Adams still do not know whether their First Amendment protected activities were

9   the basis for their being questioned by law enforcement officials using the government's "no fly" list.

10  Meanwhile, the government appears to have made its lists available to local law enforcement and to

11  foreign embassies with no publicly accessible methods for redressing mistakes, creating a false identity

12  nightmare for anyone whose name mistakenly appears on the list or is even similar to a listed name.  See

13  FBI No. 161 (previously released as a result of this litigation).

14      On this record, there can be no question that the public has a substantial interest in accessing

15  information in these withheld records.  Accordingly, Exemption 2 does not bar their disclosure.  See

16  Don Ray Drive-A-Way Company of California, Inc. v. Skinner, 785 F. Supp. 198 (D.D.C. 1992)

17  (algorithm used to determine safety fitness of motor carriers not purely internal because it affected legal

18  status of carriers, which status was adopted by other agencies without further analysis).

19      Indeed, the government still appears to be withholding information concerning the number of

20  U.S. citizens on the "no fly" list in 2002 is covered by Exemptions 2 and 3; yet such raw data cannot

21  reasonably be construed as exempt under these provisions.  See, e.g., TSA No. 41.  As this Court

22  recognized in its June 15th Order, raw numbers of individuals on the government's lists alone, is an

23  insufficient basis for withholding even SSI information.  See Order at 4.  The government has presented

24  little new to show or explain how the release of such data or similar – now dated – information will

25  permit terrorists or others to circumvent security measures.  As this Court observed in its June 15th

26  Order, "[d]efendants do not meet their burden by simply reciting that information derived from security

27  directives is sensitive security information."  Id. at 4.  Information, for example, reflecting the number of

28  times individuals were actually stopped at the airport and/or prevented from flying, the number of "false

20

1   positives" (i.e., instances where people were incorrectly identified as being on the list) and similar

2   information would in no way serve to compromise legitimate security measures.  Such materials should

3   be produced so that the public may know (as they have the right to know) "what their government is up

4   to."  United States Dept. of Justice v. Reporters Committee, 489 U.S. 749, 773 (1989).

5         Indeed, the TSA authorized SFO officials to publicly release similar information about

6   individuals detained using the "no fly" list both before this lawsuit was filed and earlier this year.  See

7   Burke Decl. ¶ 7; Exh. F (attaching records released by San Francisco Airport regarding documenting

8   numbers and information regarding individuals stopped using the "no fly" list).  Exemption 2 does not

9   provide a valid basis for withholding of such statistical information or similar information.

10  **C.   The Government Is Improperly Withholding Responsive Materials under Exemption 3**

11  **     (5 U.S.C. § 552(b)(3) – Specifically Authorized by Statute)[11]**

12        The government continues to withhold numerous pages in whole or in part based on Exemption

13  3 of FOIA, 5 U.S.C. § 552(b)(3), which allows the government to withhold information exempted by a

14  statute.  The government relies on 49 U.S.C. § 40119 and § 114(s) to justify its withholding.

15        Again, Plaintiffs do not here challenge the government's decision to withhold information under

16  Exemption 3.  As before, aside from inquiring whether Plaintiffs Gordon and Adams' names appear on

17  the "no fly" list, Plaintiffs no longer seek the "no fly" list itself, or security directives and emergency

18  amendments.  Rather, Plaintiffs continue to contend that, as to the remaining information withheld under

19  Exemption 3, that the government has failed to make the showing necessary to justify its withholdings.

20        As to information withheld pursuant to Exemption 3 (as with other exemptions), this Court's

21  June 15th Order made clear that the government's first two sets of affidavits and its *Vaughn* index fell far

22  short of detailing withheld material with reasonable specificity or describing the purported harm that

23  would result from disclosure.   The government's third set of affidavits, while lengthy, appear to be cast

24  from the same mold and offer little public confirmation that the government is not, once again, relying

25  on generic, boilerplate language to withhold information that these agencies can and are obligated to

26

27  [11]   Except for security directives and the "no fly" and selectee lists, Plaintiffs challenge the
    government's decision to withhold under Exemption 3, all information in the following documents:
28  TSA Nos. 4-6, 9-13, 15-16, 19, 24-25, 40-43, 46-52, 54, 61,150-166; FBI Nos. 4, 17, 18-21, 22-23, 25-
    27, 90, 116, 128, 129, 130, 245, and 269.

                                                21

1    readily segregate and make public.  Regarding aggregate information, it remains entirely uncertain

2    whether the government has properly segregated SSI from information that should be disclosed or

3    whether it has released all information concerning the number of times individuals were stopped at

4    airports and/or prevented from flying, the number of "false positives" (i.e., instances where people were

5    incorrectly identified as being on the list), similar statistical information and other basic information

6    about the government's use of the list.  Just as the TSA twice authorized San Francisco Airport officials

7    to produce documents relating to that airport's use of the "no fly" list, there is no legitimate reason why

8    additional documents reflecting similar information cannot be released.  See Burke Decl. ¶ 7 & Exh. F.

9         The result of the government's failure to provide a particularized description of the withheld

10   information let alone an explanation of the *basis* for the suspected harms that allegedly would occur with

11   disclosure is that Plaintiffs are denied "an opportunity to intelligently advocate release of the withheld

12   documents" and that this Court is denied "an opportunity to intelligently judge the contest."  Wiener,

13   943 F.2d at 979.  Accordingly, the government's reliance on Exemption 3 is not justified.

14   **D.    The Government Is Improperly Withholding Responsive Materials under Exemption 5
         (5 U.S.C. § 552(b)(5) – the Deliberative Process Privilege)[12]**

15

16        Exemption 5 exempts from mandatory disclosure "inter-agency or intra-agency memorandums

17   or letters which would not be available by law to a party . . . in litigation with the agency."  5 U.S.C.

18   § 552(b)(5).  This exemption shields "those documents, normally privileged in the civil discovery

19   context."  National Labor Relations Board v. Sears, Roebuck & Co., 421 U.S. 132, 149 (1975)

20   ("NLRB").  The exemption incorporates the deliberative process privilege, which protects from

21   mandatory disclosure documents that reflect agency pre-decisional deliberations.  Id. at 150.  The

22   purpose of this privilege is "to prevent injury to the quality of agency decisions" and to assure candid

23   internal debate, by protecting deliberations before a decision is reached.  Id. at 150-51.

24        Consistent with this purpose, the privilege applies only to documents that are both "pre-

25   decisional" and "deliberative."  Assembly of The State of California v. U.S. Dept. of Commerce, 968

26   _____

[12]    Except for those documents the government asserts are protected by the attorney-client privilege,
27   Plaintiffs challenge all of the government's decisions to withhold under Exemption 5, namely the
     following documents:  TSA Nos. 4-6, 9-13, 44-45, 50-51, 52, 54, 58-62, 159; FBI Nos. 17-23, 28, 29,
28   31-37, 43-49, 84, 117-118, 119, 143-144, 146, 156-157, 162, 163, 165, 176, 199, 200, 220, 224-226,
     231-233, 240, 246, 248, 249-251, 252, 254, 260-263, 270, 288-289, and 301.

1    F.2d 916, 920 (9th Cir. 1992).  The government has the burden of establishing both prongs with respect

2    to every document for which it claims the deliberative privilege.  See 5 U.S.C. § 552(a)(4)(b).  It has not

3    satisfied this burden.

4        **1.    The Government Has Failed to Establish the Withheld Documents Are
            Pre-Decisional**

5

6        To be "pre-decisional," a document must have been "prepared in order to assist an agency

7    decision-maker in arriving at his decision."  Assembly of State of California, 968 F.2d at 921, quoting

8    Renegotiation Board v. Grumman Aircraft, 421 U.S. 168, 184 (1975).  The distinction between pre- and

9    post-decisional documents "is supported not only by the lesser injury to the decision-making process

10   flowing from disclosure of post-decisional communications, but also, in the case of those

11   communications which explain the decision, by the increased public interest in knowing the basis for

12   agency policy already adopted….[T]he public is vitally concerned with the reasons which did supply the

13   basis for an agency policy actually adopted."  NLRB, 421 U.S. at 152.  The privilege is limited to pre-

14   decisional deliberations, because "it is difficult to see how the quality of a decision will be affected by

15   communications with respect to the decision occurring after the decision is finally reached…" Id. at 151.

16       The agency invoking the privilege "bears the burden of establishing the character of the decision,

17   the deliberative process involved, and the role played by the documents in the course of that process."

18   BALA, 818 F. Supp. at 1297, quoting Strang v. Collyer, 710 F. Supp. 9, 11 (D.D.C 1989), aff'd, 899

19   F.2d 1268 (D.C. Cir. 1990).  "In order for a court to find a document pre-decisional, the Court must be

20   'able to pinpoint an agency decision or policy to which the document contributed.'"  Strang, 710 F.

21   Supp. at 11, quoting Paisley v. C.I.A., 712 F.2d 686, 698 (D.C. Cir. 1983).

22       This Court has refused to hold documents "pre-decisional" where the agency's declarations and

23   Vaughn index fail to provide "the requisite factual background which would enable the reader to

24   determine what 'decision' the analysis assisted."  BALA, 818 F. Supp. at 1299-1300.  Relying heavily

25   on Wiener, U.S. District Judge Henderson in BALA ruled that boilerplate agency assertions that a

26   document contains "analysis" or "recommendations," with conclusory assertions that the document is

27   thereby "pre-decisional," is insufficient to invoke the deliberative privilege; the agency explanations

28   must be specific, factual, and tailored. See BALA, 818 F. Supp. at 1296-1300.

1    Plaintiffs agree that pre-decisional, deliberative documents are exempt from disclosure under 5

2    U.S.C. § 552(b)(5), if they legitimately contribute to an identifiable agency decision-making process.

3    For the exemption to apply, the government bears the burden of establishing "the character of the

4    decision, the deliberative process involved, and the role played by the documents in the course of that

5    process." See BALA, 818 F. Supp. at 1297 (citation omitted).  Exemption 5 will not apply unless the

6    Court is "able to pinpoint an agency decision or policy to which the document contributed…." Paisley

7    v. C.I.A., 712 F.2d 686, 698 (D.C. Cir.1983).

8    While the government contends that the TSA (though not the FBI) was engaged in some kind of

9    deliberative process in late 2002 and early 2003, it has failed to establish that each of the documents (or

10   portions of documents) withheld under Exemption 5 in fact contributed to that process, or that the

11   withheld material actually was deliberative, or that factual matter that is not exempt under FOIA cannot

12   be segregated.  For reasons detailed below, there is sufficient reason to question whether all of the TSA

13   documents withheld under Exemption 5 properly fall under the exemption.  At a minimum, the Court

14   should carefully review the documents *in camera* to determine whether the documents are predecisional

15   (*i.e.*, are in fact contributing to the deliberative processes described in the government's brief) and

16   deliberative (*i.e.*, reflect proposals or recommendations under consideration, as opposed to factual

17   matter, descriptions of present conditions, or discussions of policies or recommendations ultimately

18   relied upon or adopted by the agency.)  See National Labor Relations Board v. Sears, Roebuck & Co.,

19   421 U.S. 132, 152-53 (1975); National Wildlife Federation v. United States Forest Serv., 861 F.2d 1114,

20   1117 (9th Cir. 1988); Ryan v. Department of Justice, 617 F.2d 781, 790-91 (D.C. Cir. 1980).

21        **a.    TSA**

22   In its latest declarations, the government asserts that the information withheld by the TSA under

23   this exemption consists of  "records generated as a result of TSA's initiative to develop a new policy

24   governing the development, maintenance, and use of the No Fly List and Selectee Lists." See Pavlik

25   Decl. at ¶ 7. Section 114(h) became law on November 19, 2001.  The documents that have been

26   released by the agencies reveal that TSA was administering the "no fly" list that same month. See TSA

27   No. 2, 10.  By that time, the sheer number of individuals on the "no fly" list had grown exponentially

28   and decisions had already been reached regarding the criteria for including individuals on the list.  All of

1  the documents on the TSA's *Vaughn* index post-date the implementation of the "no fly" list, most by at

2  least a year.  Absent evidence to the contrary, it must be presumed that all of the documents dated later

3  than November 2001 are not "pre-decisional."

4          Indeed, TSA asserts that the information withheld pursuant to Exemption 5 consists of

5  deliberations "to enhance the effectiveness of TSA's security measures by, among other things, refining

6  the criteria for adding or removing individuals from the No Fly List and Selectee Lists . . . and

7  enhancing inter-agency cooperation and improving communications between TSA, other federal

8  agencies involved in the development of the No Fly and Selectee Lists and air carriers and law

9  enforcement official using the lists to screen passengers, and improving coordination and cooperation

10  with foreign government officials involved in aviation security."  See Pavlik Decl. at ¶ 9.  The

11  government insists that the withheld documents are protected "as part of the overall process of

12  developing" a draft policy to assist TSA, but this a moving target and the type of non-specific,

13  boilerplate assertion that BALA and Wiener held was insufficient to establish an exemption under

14  FOIA.

15          The government is not allowed to foreclose public access to government records simply because

16  its processes are purportedly evolving.  To do so would license the government to never release

17  information under this exemption because the government is presumably perpetually seeking to improve

18  its processes.  The Court should deny the government's second motion for summary judgment on the

19  grounds that the government has failed to meet its burden of establishing the exemption.  See Lion

20  Raisins Inc., 354 F.3d at 1072 ("Whether a particular set of documents gives the court an adequate

21  factual basis for its decision is a question of law.").

22          Moreover, it is plain from the unredacted TSA material and the government's motion that the

23  withheld documents are not pre-decisional at all, but rather discuss the implementation of decisions that

24  already had been reached, or problems encountered in that implementation.  This appears to be the case

25  for all the documents withheld under Exemption 5.  Particular examples include TSA No. 44

26  (December 16, 2002 email discussing "49 CFR 1520," which was promulgated ten months earlier (see

27  67 Fed. Reg. 8340)); and TSA No. 159 (responding to General Accounting Office survey about existing

28  watch list polices).  Such documents are not protected by Exemption 5, even if they contain discussions

1  of prior deliberations that led to the agency's decision:  whatever interest decision-makers have in

2  shielding their previous deliberations is outweighed by the public interest in understanding the agency's

3  working law and policies.  See NLRB, 421 U.S. at 152-53.

4       **b.  FBI**

5       Like the deficiencies of the TSA, the FBI's latest declaration fails to link documents to any

6  particular decision-making process.  Just as in BALA, the FBI has again failed to meet its burden of

7  establishing that each document is pre-decisional and deliberative.

8       The Gehle declaration, much like the earlier Hardy Declarations that this Court implicitly found

9  deficient, does not provide any specific information describing an actual decision-making process.  It

10  does not indicate what role any particular document played in any such process.  It fails to state with

11  particularity whether the withheld material ultimately was relied upon in subsequent agency action. As

12  such, it provides the Court and Plaintiffs with no meaningful information to evaluate the application of

13  the exemption.  See BALA, 818 F. Supp. at 1299-1300.

14       Moreover, the government's attempt to claim protections for its vague, "ongoing" deliberations

15  is unavailing.  The purpose of Exemption 5 is not to protect all discussions about implementing or

16  improving an existing policy.  The purpose is to protect deliberative decision-making.  Without a link to

17  a discernable agency decision-making process, Exemption 5 would always swallow FOIA's

18  presumption of disclosure.  The Ninth Circuit has noted that a document will not be deemed pre-

19  decisional unless it is linked to a process:

20            An argument that documents are "pre-decisional because they may be
21            used in the future ... proves far too much.  Any memorandum always will
              be 'pre-decisional' if referenced to a decision that possibly may be made
22            at some undisclosed time in the future....'  Characterizing these
              documents as 'pre-decisional' simply because they play into an ongoing
23            audit process would be a serious warping of the meaning of the word.'"

24  Assembly of California, 968 F.2d at 921.

25       The FBI, as well as the TSA to the extent it seeks to characterize its ongoing issuance of security

26  directives as a deliberative process, seek to apply Exemption 5 to decision-making without any

27  discernable contours.  The Court should reject this expansive view of the statutory exemption.  As with

28  the TSA documents, the FBI documents are dated long after the November, 2001 implementation date

1    of the "no fly" list (many of the FBI documents also are undated).  The FBI has once again provided

2    insufficient support for any argument that its documents are pre-decisional.

3           **2.      The Government Has Failed to Establish the Withheld Documents Are Deliberative**

4                  For the Exemption 5 deliberative privilege to apply, withheld information must also be

5    deliberative.  "Factual material that does not reveal the deliberative process is not protected by this

6    exemption."  National Wildlife Federation v. United States Forest Serv., 861 F.2d 1114, 1117 (9th Cir.

7    1988), quoting Paisley, 712 F.2d at 686.  Facts in an otherwise deliberative, pre-decisional document

8    must be segregated and disclosed where possible unless they are "inextricably intertwined" with exempt

9    portions.  Ryan v. Department of Justice, 617 F.2d 781, 790-91 (D.C. Cir. 1980) (internal quotation

10   marks omitted); BALA, 818 F. Supp. at 1300.  Additionally, a document is not "deliberative" if it

11   includes a recommendation or opinion ultimately relied upon in subsequent agency action.  NLRB, 421

12   U.S. at 152-53.

13                 The government argues, for example, that TSA No. 41 should be treated as deliberative and

14   pre-decisional, though it is plainly neither.  It post-dates, and appears on its face unconnected to, any

15   decision regarding the watchlists.  Moreover, rather than segregate and disclose factual material, the

16   TSA continues to withhold (under Exemption 5) a portion of TSA's factual response to survey questions

17   posed in a General Accounting Office survey about watchlists.  The FBI also continues to withhold what

18   appears to be similar documents, in their entirety, on this ground.  See, e.g., FBI Nos. 17, 18-23.  There

19   is no conceivable basis for the government's insistence that Exemption 5 shields these and similar kinds

20   of documents from disclosure.

21                 All of the other partially-released TSA documents for which TSA claims Exemption 5 similarly

22   appear on their face to be informational, not deliberative.  For example, TSA Nos. 4 and 6 are part of the

23   slide show prepared by the TSA, briefing the FBI on the "no fly" list.  The portions redacted pursuant to

24   Exemption 5 describe the existing criteria and manner of implementation, not a deliberation of new

25   ones.  TSA No. 61-62 appears to be an inquiry from outside the agency about the new policies; as with

26   the other TSA documents, there is no indication of a direct tie to any policy being deliberated.  The FBI

27   has again also failed to provide sufficient information to determine whether the documents it has

28   withheld are truly deliberative.

1        Accordingly, the government has failed to meet its burden regarding this claimed exemption.

2  **E.    The Government Has Improperly Withheld Responsive Material under Exemption 6
        (5 U.S.C. § 552(b)(6) – Clearly Unwarranted Invasion of Privacy Information)[13]**

3

4        In contravention of this Court's June 15th Order, the government continues to withhold

5  information under Exemption 6 including the names of many government employees involvement in the

6  administration of the "no fly" list.  See Order at 6.  Absolutely none of the records still in dispute

7  disclose "personal information about the officials."  See Order at 7.  As this Court previously

8  recognized, the government may only withhold records under Exemption 6 that are "personnel and

9  medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of

10  personal privacy."  5 U.S.C. § 552(b)(6).  Interpreting the phrase "clearly unwarranted," the statute

11  "instructs the court to tilt the balance in favor of disclosure."  Getman v. NLRB, 450 F.2d 670, 674

12  (D.C. Cir. 1971), stay denied, 404 U.S. 1204 (1971); see also Rose, 425 U.S. at 378, n.16 (phrase

13  "clearly unwarranted" is the major restraining feature of Eexemption 6 which controls the ability of the

14  agency to withhold information).  To support a withholding under Exemption 6, the privacy invasion

15  must be tangible and substantial; that is "[e]xemption 6 was directed at threats to privacy interests more

16  palpable than mere possibilities."  Rose, 425 U.S. at 380 n. 19; see also Church of Scientology of

17  California v. U.S. Dept. of the Army, 611 F.2d 738, 745 (9th Cir. 1980).

18        Four factors are to be balanced in weighing whether documents may be withheld under

19  Exemption 6:  (1) the plaintiff's interest in disclosure; (2) the public interest in disclosure; (3) the degree

20  of the invasion of personal privacy; and (4) the availability of any alternative means of obtaining the

21  required information.  Church of Scientology, 611 F.2d at 746; see also Dobronski v. FCC, 17 F.3d 275

22  (9th Cir. 1994) (balancing four factors in favor of public disclosure of attendance and sick leave records

23  of assistant bureau chief of FCC); Van Bourg v. NLRB, 728 F.2d 1270 (9th Cir. 1984) (balancing four

24  factors in favor of public disclosure of names and addresses of employees eligible to vote in union

25  representation election).  In weighing these factors, the court must "keep in mind that the invasion of

26  privacy must be 'clearly' unwarranted."  Church of Scientology, 611 F.2d at 746.

27

28  _____
[13]     Plaintiffs challenge the TSA's withholdings under Exemption 6, namely:  TSA Nos.  1, 19, 22, 23, 24, 25, 40, 41, 44-50, 52, 58-61, 150, 160 and 11.

1    Here, notwithstanding this Court's June 15th Order, the TSA continues to withhold the names of

2  what it characterizes as "low-level" TSA employees who were actively involved in implementing and

3  enforcing the administration of the TSA's "no fly" list.  See Pavlik Decl. ¶¶ 22-28.  The TSA also

4  continues to withhold the names of individuals with names that are "the same or similar to someone on

5  the TSA watchlists" and other individuals who have corresponded with the government to resolve

6  potential misidentification problems.  See Pavlik Decl. at ¶ 29.[14]

7    TSA's withholding of these names fails under all four of the exemption 6 factors.[15]  First,

8  Plaintiffs have an undeniable interest in disclosure.  This case began when Plaintiffs Gordon and Adams

9  were told that their names appeared on the "no fly" list.  More than two years later, they continue to be

10  denied basic information about the government's administration of this list, including whether their

11  names actually appear on the list and whether their First Amendment protected activities had anything to

12  do with their being stopped and questioned by law enforcement officials.  Now, TSA seeks to deny them

13  information about who at TSA was in charge of implementing and enforcing the list – information that

14  might help clarify, among other things, how seriously TSA took the problem of innocent Americans like

15  Plaintiffs Gordon and Adams being incorrectly stopped because of the list.  Plaintiffs Gordon and

16  Adams deserve to know, among other things, the names and the corresponding official activities of those

17

18  [14]    Unlike Defendant FBI, which seeks to withhold agent names under Exemption 7(C), TSA seeks
to withhold these names pursuant to Exemption 6.  In contrast to Exemption 7(C), which requires the
19  government to show "an unwarranted invasion of personal privacy," Exemption 6 requires the
government to demonstrate a "clearly unwarranted invasion of personal privacy."  Thus, as the Ninth
20  Circuit has noted, "the threat to privacy interests that many justify nondisclosure in an Exemption 7(C)
case may warrant disclosure in an Exemption 6 case."  Dobronski, 17 F.3d at 279 (citation omitted).

21  [15]    As a preliminary matter, even under the permissive definition of "similar files" enunciated in
22  United States Dept. of State v. Washington Post Co., 456 U.S. 595 (1982), the names at issue do not
constitute "detailed Government records on an individual which can be identified as applying to that
23  individual."  Id. at 602 (citing and quoting legislative history of FOIA).  The withheld names in this case
are contained, for the most part, in emails, presentations, and memoranda – documents that contain no
24  personal information about an individual other than identifying that she was the author or recipient of a
particular document.  See, e.g., TSA Nos. 1 (title page to slide show), 19 (names in to/from line of
25  email), 21 (names in to/from line of email), 22 (names in header of memo), 24-27 (names in to/from
lines of emails), 40 (names in header of memo), 41 (names in to/from lines of email), 44-53 (names in
26  headers of emails, memoranda), 58-60 (names assigned tasks as part of "watch list working group"), 61-
62 (names in headers of emails and correspondence), 150-161 (TSA contact person for GAO
27  questionnaire; names of TSA employees involved in maintaining no fly list).  If (as TSA appears to
argue) names in these kinds of documents constitute "detailed Government records" about an individual,
28  every agency file containing names of agency employees would effectively be subject to an Exemption 6
withholding, and the Exemption would swallow the rule.

29

1    involved in carrying out the government's watch list.  Plaintiffs also have an high interest in determining

2    who, and how many, other individuals were incorrectly stopped as a result of the list, and whether and

3    how airline employees were involved in the list management process (particularly given that Plaintiffs'

4    experience with the list began with their interaction with an American Trans Air check-in agent).

5          As to the second factor, again, even the TSA acknowledges the substantial public interest in the

6    government's management and implementation of the "no fly" list.  See Hardy Decl. ¶ 72 (noting

7    "intense media scrutiny" of the "no fly" list).  If records obtained from SFO during a six-month period

8    are any indication, hundreds of passengers at that airport alone (and likely thousands of passengers

9    across the country) are being stopped and questioned as a result of the "no fly" list.  See Srikantiah

10   Decl., Exh. C (chart summarizing records of stops at SFO).  For several years now, the media has

11   focused considerable attention on the secrecy issues raised by the government's "no fly" list.  See Burke

12   Decl., Exh. D; 12/01/04 Burke Decl., & Exh. A.  Accordingly, the public's interest in disclosure of

13   information about the list – including those individuals within TSA who were involved in its

14   implementation and enforcement – and whether TSA took complaints about the list seriously enough to

15   assign high-level employees to its management – remains undeniably great.

16         Here, for example, TSA continues to withhold the name of the so-called "low-level" individuals

17   at TSA who prepared the TSA slide show about the "no fly" and selectee lists, the agency employees

18   responsible for responding to a questionnaire from the GAO, and the names of "low-level" TSA

19   employees assigned major tasks as part of the watch list task force, among other things. See, e.g., TSA

20   Nos. 1 (title page to slide show), 58-60 (names assigned tasks as part of "watch list working group"),

21   150, 160-161 (TSA contact person for GAO questionnaire; names of certain TSA employees involved in

22   maintaining "no fly" list).  Despite the ageny's artful characterization of these employees' status, this is

23   precisely the kind of information that would help understand how the TSA managed the "no fly" list,

24   and how it handled the numerous problems associated with the list.

25         The public also has a substantial interest in TSA's response to complaints from other passengers,

26   as well as the role of airline employees in the list's management.  In the typical case involving the "no

27   fly" list (as with Plaintiffs Gordon and Adams), passengers first learn that their names have been placed

28   on the list through airline employees.  See generally Burke Decl., Exh. D (attaching news media

1   articles); 12/01/04 Burke Decl., & Exh. A.  Releasing the names of other passengers who have

2   complained about problems with the government's list may facilitate a greater understanding of the

3   scope of the problems with the "no fly" list.  Indeed, the TSA has made no showing that these

4   individuals have any expectation of confidentiality.  See Pavlik Decl. at ¶ 29.  Nor do any of the

5   documents the government is withholding suggest any such expectation.  See TSA Nos. 22-23, 40-41,

6   61-62, and 162.

7          The third factor – the degree of invasion of personal privacy – also weighs heavily in favor of

8   disclosure.  Again, only names are sought.  Plaintiffs are not asking for the addresses, phone numbers,

9   email addresses, social security numbers, or personnel records of TSA employees or other passengers

10  involved in the management of the "no fly" list.  The limited information Plaintiffs seek is a non-

11  intrusive peek into the TSA's otherwise extraordinarily secret administration of this post-September 11th

12  security program.  Plaintiffs seek only individuals' names – information that would indicate how

13  seriously TSA took the problem of innocent Americans being incorrectly stopped in connection with the

14  list (by the association of the names with the work the individuals performed).  This is precisely the kind

15  of information that Congress intended for agencies to release under FOIA.  See Berry v. Dept. of Justice,

16  733 F.2d 1343, 1350 (9th Cir. 1984) (legislative purpose of FOIA "was to pierce the veil of

17  administrative secrecy and to open agency action to the light of public scrutiny.") (citations omitted).

18         In its third opportunity to do so, the TSA has utterly failed to proffer *any* credible evidence to

19  support the potential "harassment" the agency suggests will follow its employees and others if names are

20  disclosed.  In fact, based on the government's "showing," the potential invasion of personal privacy as

21  to airline employee and complaining passengers' names appears low, if it exists at all.  Indeed, the

22  TSA's position regarding the disclosure of names is truly ironic.  Literally overnight, TSA overhauls a

23  suspected terrorist watch list that immediately results in innumerable innocent Americans being treated

24  like potential terrorists.  Now, the agency claims it cannot release the names of those who complain to

25  TSA because "such association with a terrorism watchlist could be easily misconstrued by the public

26  and thereby subject these individuals to undue publicity, speculation, harassment and/or

27  embarrassment."  See Riep-Dice Decl. at 11 ¶ 9; Pavlik ¶ 29.  It is the TSA who created the list that

28  repeatedly resulted in embarrassment to innocent Americans – and now TSA seeks to hide behind the

31

1   embarrassment it created to justify its refusal to disclose information to the American public, which (if

2   press accounts are any indication) the public is deeply interested in.  See generally Burke Decl., Exh. D

3   (attaching articles); 12/01/04 Burke Decl. & Exh. A.

4           The fourth and final factor – whether there are alternative means of obtaining the information –

5   also favors disclosure to the public and Plaintiffs.  Plaintiffs have spent considerable resources

6   attempting to gather information related to the "no fly" list from SFO, and other than the meager amount

7   of information that the government voluntarily released after this litigation commenced and the

8   government's disclosures of this summer, only limited information has become publicly available.

9           In sum, the government's reliance on Exemption 6 to withhold name information remains

10  misplaced and unsupportable.  This Court need not change its position regarding this Exemption.

11  **F.      The Government Has Improperly Withheld Responsive Material under Exemption 7(C)
            (5 U.S.C. § 552(b)(7)(C) – Unwarranted Invasion of Privacy)[16]**

12

13          Exemption 7(C) provides that materials may be withheld by an agency if they are "records or

14  information compiled for law enforcement purposes, but only to the extent that production of such law

15  enforcement records or information … (C) could reasonably be expected to constitute an unwarranted

16  invasion of privacy."  5 U.S.C. § 552(b)(7)(C).  The threshold determination for exemption 7(C) is,

17  therefore, whether a withheld record was compiled for "law enforcement purposes," or, stated

18  differently, compiled to prosecute those who have violated the law.  See Getman, 450 F.2d at 673

19  (documents falling under exemption 7(C) are "files prepared by Government agencies to prosecute law

20  violators").  Where the releasing agency has a clear law enforcement mandate, it must only establish a

21  rational nexus between the enforcement of a federal law and the document for which exemption 7(C) is

22  claimed.  However, the court need not accept the government's claim that an investigation had law

23  enforcement purposes if the asserted purpose is pretextual or not credible.  See Rosenfeld v. U.S. State

24  Dept. of Justice, 57 F.3d 803, 808 (9th Cir. 1995) (FBI documents generated during effort to remove

25  President of UC Berkeley because agency disagreed with his politics and monitoring of First

26

---

27  [16]     Plaintiffs challenge all of the government's decisions to withhold information under Exemption
    7(C), namely in the following documents:  FBI Nos. 1-5, 11, 15-16,  24, 28-53, 61-66, 71-79, 81-82, 84,

28  0-, 98, 104-105, 116-124, 128-145, 147-148, 152, 154-158, 159, 160-184, 195-215, 195-215, 219-228,
    231-238, 240, 244, 246-250, 252-271, 273-282, 284-292, 307-310, 314.

32

1  Amendment student group had no rational nexus to law enforcement), cert. denied, 516 U.S. 1103

2  (1996); Weissman v. Central Intelligence Agency, 565 F.2d 692 (D.C. Cir. 1977) (investigation of

3  candidate for possible recruitment by CIA not for law enforcement purposes).

4      If the documents have been compiled for law enforcement purposes, the Court must then balance

5  the public's interest in disclosure of responsive information against privacy interests in that information.

6  Getman v. NLRB, 450 F.2d 670, 674 (D.C. Cir. 1971). See Castaneda v. U.S., 757 F.2d 1010, 1012 (9th

7  Cir. 1985), Rose, 425 U.S. at 376-77. While federal employees and third parties mentioned in agency

8  records have a recognized privacy interest in matters that could subject them to harassment or

9  embarrassment (see, e.g., Baez v. Dept. of Justice, 647 F.2d 1328 (D.C. Cir. 1980)), consistent with the

10  statutory purpose of FOIA, the public has a clear interest in information "that sheds light on an agency's

11  performance of its statutory duties" or contributes to "public understanding of the operations or activities

12  of the government." U.S. Dept. of Justice v. Reporters Committee, 489 U.S. 595, 773, 775 (1989).

13      The FBI, even after this Court's June 15th Order, almost without exception -- and in contrast to

14  the recent decision of the TSA to disclose the names of individuals other than "low-level" TSA

15  employees -- continues to withhold the names of individuals appearing on each of the documents

16  responsive to Plaintiffs' FOIA requests.  In effect, the agency asserts a blanket exemption for all names

17  mentioned in those documents.  However, there is no such blanket exemption under FOIA, and while

18  some of these names may be legitimately withheld due to privacy concerns, it is highly likely that many

19  should be disclosed. See Castaneda, 757 F.2d at 1010 (ordering disclosure of name of USDA agent);

20  Ferguson, 448 F. Supp. at 923 (names of FBI agents involved in investigation and of local police not

21  exempt under 7(C) absent showing that disclosure would endanger agents).

22      The documents at issue here are even further removed from any law enforcement purpose than

23  those at issue in Rosenfeld, which concerned an improper FBI investigation of members of a political

24  protest organization at UC Berkeley.  The Ninth Circuit held that documents concerning that

25  investigation – including the names of third parties who were the subjects of it – were not exempt from

26  disclosure under exemption 7(C), stating:

27          The public interest in this case in knowing whether and to what extent the
            FBI investigated individuals for participating in political protests, not

28          federal criminal activity.  Disclosing the names of the investigation

33

1
2

> subjects would make it possible to compare the FBI's investigations to a
> roster of the [organization's] leadership.  Therefore, disclosing the names
> of the investigation subjects promotes the public interest of this FOIA
> request.

3   Rosenfeld, 57 F.3d at 812.

4          As to the names of FBI employees redacted from the documents, the government's contention

5   that disclosure would result in unauthorized inquiries and harassment is purely speculative.  As with the

6   TSA, the government has again proffered no admissible evidence to support the parade of horribles it

7   imagines if names were released to the public.  In addition, for many of the documents, the public

8   interest has a legitimate interest in knowing who has written, received or is referred to in them

9   outweighs what is in most instances, a nominal privacy interest.  For example, the public has a strong

10  interest in knowing the names of the individuals referred to in documents such as FBI Nos. 158 and 160,

11  which reflect that, long after the "no fly" list was implemented, there was still significant confusion

12  about the most basic aspects of the list.  Just who was confused and their rank within a given agency

13  would shed light on how well (or poorly) the government was implementing the "no fly" list with the

14  attendant risks to innocent people who were detained by law enforcement authorities.

15         The public has a compelling interest in learning the identities of those who raised and discussed

16  this and similar problems or were tasked with remedying such problems, as well as how far up the chain

17  of command they stood.  Such information would reflect whether the agencies are taking seriously their

18  obligation to ensure that the rights of Americans were not improperly infringed by the "no fly" list.

19  Similarly, the public has a substantial interest in learning whether the names of individuals contained in

20  documents concerning or discussing whether or not people had been included on the "no fly" list as a

21  result of their First Amendment activities or for some other improper purpose, and that this interest is

22  sufficient to override any purported privacy interest.  See, e.g., FBI  Nos. 200, 201, 219, 255, 257-259,

23  265, 267, 268, 300, 301, 304-308.

24         As this Court correctly determined earlier this summer regarding Exemption 7(C), the

25  government has not "met their burden of showing that each and every name is exempt."  See Order at 6.

26

27

28

**G.    The Government Is Improperly Withholding Responsive Materials under Exemption 7(E) (5 U.S.C. § 552(b)(7)(E) – Law Enforcement Investigations)[17]**

The government may withhold records under exemption 7(E) only if it demonstrates that the documents were (1) "compiled for law enforcement purposes" and (2) would either disclose "techniques or procedures for law enforcement investigations" or "guidelines for law enforcement investigations." 5 U.S.C. § 552(b)(7)(E).  The government "always bears the burden to show that a given document is covered by an exemption and should be withheld." Rosenfeld, 57 F.3d at 807.  Although courts must "accord a degree of deference to a law enforcement agency's decisions to investigate," courts are not required to accept the government's assertions of a "law enforcement purpose if the asserted purpose is pretextual or wholly unbelievable." Rosenfeld, 57 F.3d at 807, quoting Pratt v. Webster, 673 F.2d 408, 421 (D.C. Cir. 1982).

When determining whether a "law enforcement purpose" is present, "courts must look to the purpose behind the compilation of the document." Church of Scientology v. Dept. of the Army, 611 F.2d 738, 748 (9th Cir. 1979).  The agency must show that the files "were compiled for adjudicative or enforcement purposes." Id.  "Generally, files such as 'internal audits' compiled simply to determine whether an agency's internal operations comport with [a] statute or regulation do not qualify" as documents "compiled for law enforcement purposes" under exemption 7(E). Id.

In Rosenfeld, the FBI relied on Exemption 7(E) to withhold files it compiled about University of California Chancellor Clark Kerr in the 1950s and 1960s.  The district court and the Ninth Circuit, however, held that exemption 7(E) did not apply to many of the documents, finding that many documents were "compiled with no rational nexus to a plausible law enforcement purpose – that any asserted purpose for compiling these documents was purely pretextual." Rosenfeld, 57 F.3d at 809.  The Ninth Circuit concluded that the documents "strongly support the suspicion" that the FBI was investigating the chancellor "because FBI officials disagreed with his politics or his handling of administrative matters" and the FBI was trying to engineer his dismissal. Id.  "Conspicuously absent from these [FBI] documents is any connection to any possible criminal liability by Kerr" and the

---

[17]    Plaintiffs challenge all of the government's decisions to withhold under Exemption 7(E), namely as to the following documents:  FBI Nos. 1, 4, 14-17, 18-21, 22-23, 25-27, 28, 29, 30, 33, 37-44, 46-52, 61-64, 67-70, 75-76, 84-90, 96-98, 104-105, 116-131, 134-148, 152, 155-157, 162-163, 165, 166-168, 181, 196, 197, 202, 213, 221, 223-226, 231-237, 239, 240, 244-249, 252, 254, 256, 260-263, 264-265, 287-289.

1  documents constitute "precisely the sort of generalized monitoring and information-gathering that are
2  not related to the Bureau's law enforcement duties."  Id.

3        The Ninth Circuit also affirmed the disclosure of some of the FBI's documents compiled on a
4  Berkeley political group, the Free Speech Movement, concluding that the documents "strongly suggest"
5  that the FBI was monitoring the group's activities "to harass political opponents of the FBI's allies
6  among the [UC Board of] Regents" and to investigate the group's leader for his "contemptuous
7  attitude," and "not to investigate subversion and civil disorder."  Id. at 810-811.  In other words, the FBI
8  cannot use Exemption 7(E) to justify nondisclosure of data it has collected about individuals or groups
9  for political reasons because the FBI's conduct is not related to a legitimate criminal investigation.

10        Rosenfeld and Church of Scientology demonstrate that the FBI cannot meet its burden to justify
11  the secrecy of many of the withheld or redacted documents under Exemption 7(E).   Many of the FBI
12  documents that have been withheld or redacted are agency memos and emails.  In these cases, the FBI
13  has not met its burden of demonstrating that the memos and emails are documents "compiled for law
14  enforcement purposes," as required under Exemption 7(E).

15        Some emails and memos discuss problems with false positives and mistakes with the "no fly"
16  list, and possible solutions to deal with those problems.  See, e.g., FBI No. 248 ("This whole issue needs
17  to be revisited"); FBI No. 268 ("I've been preaching the exact same problems here").  The FBI has not
18  demonstrated – nor can it – that these emails and memos are related to a criminal investigation or
19  adjudication, or would reveal law enforcement investigative techniques.  Instead, these memos and
20  emails appear akin to internal audits, which are not exempt from disclosure under Exemption 7(E).  See
21  Church of Scientology, 611 F.2d at 748.  As such, disclosing the full text of these emails and memos
22  would not reveal any law enforcement techniques or ongoing investigations of criminal activity.

23        For these reasons, the FBI should be required to release all documents that are not related to a
24  law enforcement investigation or adjudication, and do not reveal law enforcement techniques or specific
25  law enforcement investigations of criminal activity.

26  **H.**    **Under the Privacy Act, Plaintiffs Have a Right of Access to Responsive Documents in the
     Possession of the Government**
27

28        Section 552a(j)(2) of the Privacy Act allows a federal agency to deny access to its records that

1  are "maintained by an agency … which performs as a principal function any activity pertaining to the

2  enforcement of criminal laws … and which consists of . . . information compiled for the purpose of a

3  criminal investigation."  To exempt a records system from public access under the Privacy Act, an

4  agency must promulgate rules and state the reasons the records system is exempt from public disclosure.

5  See Exner v. FBI, 612 F.2d 1202, 1204 (9th Cir. 1980).

6       **1.**      **The FBI's Inadequate Privacy Response**

7       The Privacy Act provides that the head of any agency may exempt systems of records from the

8  Privacy Act by publishing proposed regulations in the Federal Register, according to the rule-making

9  requirements of the Administrative Procedure Act.  The regulations must name the system of records,

10  and state why the particular system of records is to be exempted from a provision of the Privacy Act.

11  5 U.S.C. § 552a(k).  Any person has the right to file a rule-making petition requesting the amendment or

12  repeal of an exemption.  49 C.F.R. § 1063(d).

13       Under the Department of Justice Regulations, 28 C.F.R. § 16.69, the FBI's Central Records

14  System ("CRS") are exempt from the individual disclosure requirements of Section 552a(d)(1) of the

15  Privacy Act.  Under 28 C.F.R. § 16.69(a), the CRS is defined as the "administrative, applicant, criminal,

16  personnel and other files compiled for law enforcement purposes" by the FBI.  The Department of

17  Justice regulations state that the exemption of the CRS from individual disclosure requirements is

18  necessary because such access to the FBI's CRS "might compromise ongoing investigations, reveal

19  investigatory techniques or confidential informants … [a]nd the [exemption] protect[s] the security of

20  information classified in the interest of national defense and foreign policy."  28 C.F.R. § 16.69(b)(2).

21       However, these regulations do not permit the FBI to withhold every document compiled about

22  Plaintiffs.  The FBI may withhold only those documents about Plaintiffs that have been placed in the

23  FBI's CRS and which were compiled "for law enforcement purposes" and "for the purpose of a criminal

24  investigation."  5 U.S.C. § 552a(j)(2); 28 C.F.R. § 16.69(a), (b)(2).  The cases cited by the FBI to justify

25  its failure to disclose information about Plaintiffs Gordon and Adams are inapposite.  In Exner, 612 F.2d

26  at 1205-1206, the Ninth Circuit concluded that "all the information on [plaintiff] was contained in

27  criminal investigatory files located in the [FBI's] Central Records System, and regulation section

28  16.69(a) has activated the (j)(2)(B) exemption with respect to the Central Records System."  Similarly,

1   in <u>Falwell v. Executive Office of the President</u>, 158 F. Supp.2d 734, 739-40 (W.D.Va. 2001), the court

2   found that the documents about plaintiff were contained in the CRS, and pertained to investigations of

3   alleged crimes against plaintiff.

4           The FBI's *Vaughn* Index and release of one redacted email reveal that the FBI indeed found

5   documents about Plaintiffs that are outside of the CRS, which were required to be disclosed under the

6   Privacy Act.  <u>See</u> FBI Nos. 308-310.  However, the FBI maintains that "no records responsive to

7   Plaintiffs Gordon and Adams' Privacy Act requests" were found.  Hardy Decl. at 14 n.21.  As the

8   government correctly states, Plaintiffs requested "[a]ll records prepared, collected, and/or maintained by

9   the FBI about the placement of Ms. Adams' or Ms. Gordon's names or identifying information on the

10  list commonly referred to as the 'no fly' list."  <u>See</u> Hardy Decl. at 3, n.4.  The FBI asserts that it

11  conducted a search in December 2002 and January 2003 in response to Plaintiffs' FOIA and Privacy Act

12  requests, and found no responsive records in its CRS.  <u>See</u> Hardy Decl. ¶¶ 8, 10-11.  However, *after*

13  Plaintiffs filed their complaint, the FBI conducted another search of the CRS and other sources of FBI

14  documents, and located 325 pages of responsive documents.  <u>Id.</u> at ¶¶ 25, 29.  One of the responsive

15  documents was the email from the *Wall Street Journal* article about the Plaintiffs' alleged placement on

16  the "no fly" list.  Thus, Hardy's footnote in his declaration stating that "as noted earlier, the FBI search

17  of the CRS indices revealed no records responsive to plaintiffs Gordon and Adams' Privacy Act request

18  for documents on themselves," tells only the first part of the story.  <u>See</u> Hardy Decl. at 14, n.21.

19          The FBI has failed to satisfy its burden of demonstrating that it has reviewed all non-criminal

20  law enforcement documents "about" the placement of Ms. Adams' and Ms. Gordon's names on the "no

21  fly" lists or its  burden of demonstrating that it has found no responsive documents.

22          **2.      The TSA's Inadequate Privacy Response**

23          The TSA's Privacy Act response suffers from the same lack of clarity.  The TSA contends that it

24  cannot confirm or deny whether Plaintiffs are listed on the TSA's "no fly" list because that list is part of

25  its Investigative Records System ("IRS"), which is exempt from individual disclosure under the Privacy

26  Act pursuant to 49 C.F.R. §§ 10.61(a), § 10.63 and Part 10 App.  Thus, the TSA's assertion that the

27  agency does not have any other records relating to the individual plaintiffs is not supported by any

28  evidence.   Instead, the Declaration of Patricia M. Riep-Dice merely states that it "could neither confirm

1   nor deny the existence of records responsive" to Plaintiffs' request for TSA documents "about" their

2   placement on the "no fly" list.  See Riep-Dice Decl. ¶ 12.  The Riep-Dice Declaration does not state that

3   the TSA "does not have any other records relating to the individual plaintiffs."  Thus, the TSA has failed

4   to meet its burden of demonstrating that it has not located any documents relating to Plaintiffs from TSA

5   document sources outside of the IRS.

6         More fundamentally, the TSA incorrectly asserts that the "no fly" list is exempt from the Privacy

7   Act's disclosure requirements because it was previously part of the Federal Administration

8   Administration's IRS, which the Secretary of Transportation declared exempt from the Privacy Act's

9   disclosure requirements by publishing a notice in the Federal Register in the 1990s.  See Defendants'

10  Memorandum at 51-52.  But the government concedes that these regulations were promulgated before

11  Congress created the TSA, and before the TSA created its version of the "no fly" list.  The government

12  does not argue – nor could it – that a government agency could adopt regulations that would keep secret

13  any future aviation record systems.  This would defeat the purpose of the publication of exemptions in

14  the Federal Register, and the appeal process.  Thus, because the government has not published a

15  regulation in the Federal Register exempting the TSA's system of records otherwise known as the "no

16  fly" list or the selectee list.  The TSA must disclose to Plaintiffs Gordon and Adams whether their names

17  appear on those lists.

## VII.   CONCLUSION

18

19        In this post-September 11th era, the government's constant focus on threats to the security of the

20  nation is understandable.  But this focus cannot be pursued blindly, for, as the Fourth Circuit has noted:

21              History teaches us how easily the spectre of a threat to "national security"
                may be used to justify a wide variety of repressive governmental actions.
22              A blind acceptance by the courts of the government's insistence on the
                need for secrecy, without notice to others, without argument, and without
23              a statement of reasons would impermissibly compromise the independence
                of the judiciary and open the door to possible abuse.
24

25  In re The Washington Post Co., 807 F.2d 383, 391-92 (4th Cir. 1986).  Despite three attempts to justify

26  the documents they withhold, the government has failed to satisfy its obligations under FOIA and the

27  Privacy Act and accordingly, their motion for summary judgment should be denied, and Plaintiffs'

28  second motion for summary judgment should be granted.

39

DATED December 1, 2004

DAVIS WRIGHT TREMAINE LLP

AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA

\s\

_____

Thomas R. Burke

Attorneys for Plaintiffs Rebecca Allison Gordon, Janet Amelia Adams, and American Civil Liberties Union Foundation of Northern California

40

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................1

II.    FACTUAL BACKGROUND ............................................................2

    A.    The Plaintiffs in This FOIA and Privacy Act Lawsuit ..............................2

    B.    Law Enforcement Officials Detain Plaintiffs Gordon and Adams at SFO Based on "No Fly" List...........................................................3

    C.    Public Records Released by SFO Confirm Use of "No Fly" List ...........3

    D.    Plaintiffs' December 12, 2002 FOIA Requests to the FBI and TSA......3

    E.    FBI Responds That It Has "No Records" Responsive to Plaintiffs' FOIA Requests ........................................................5

    F.    TSA Denies Plaintiff ACLU-NC's Fee Waiver Denial; ACLU-NC Appeals........5

    G.    The Government's Use of "No Fly" Lists Is Widely Reported in the Media........6

    H.    Public Documents from SFO Show Hundreds of Travelers Detained Using the "No Fly" List.....................................10

III.    PROCEDURAL HISTORY...........................................................11

IV.    INFORMATION AT ISSUE IN THIS DISPUTE ......................12

VI.    LEGAL ANALYSIS........................................................................14

    A.    As a General Matter, the Government Has Failed to Provide Adequate Detail as to Its Withholding and Segregation Decisions ......14

        1.    The Government Fails to Adequately Describe Its Decisions to Withhold Information under Exemptions to FOIA.................14

        2.    The Government Continues to Inadequately Segregate Information That Should Be Disclosed to Plaintiffs.................15

    B.    The Government Is Improperly Withholding Responsive Materials under Exemption 2 (5 U.S.C. § 552(b)(2) – Interagency Records) .................17

    C.    The Government Is Improperly Withholding Responsive Materials under Exemption 3 (5 U.S.C. § 552(b)(3) – Specifically Authorized by Statute)..........21

    D.    The Government Is Improperly Withholding Responsive Materials under Exemption 5 (5 U.S.C. § 552(b)(5) – the Deliberative Process Privilege)............22

        1.    The Government Has Failed to Establish the Withheld Documents Are Pre-Decisional..................................23

i

    2.     The Government Has Failed to Establish the Withheld Documents
Are Deliberative.................................................................................................27

E.    The Government Has Improperly Withheld Responsive Material under
Exemption 6 (5 U.S.C. § 552(b)(6) – Clearly Unwarranted Invasion of
Privacy Information)...........................................................................................28

F.    The Government Has Improperly Withheld Responsive Material under
Exemption 7(C) (5 U.S.C. § 552(b)(7)(C) – Unwarranted Invasion of
Privacy)................................................................................................................32

G.    The Government Is Improperly Withholding Responsive Materials under
Exemption 7(E) (5 U.S.C. § 552(b)(7)(E) – Law Enforcement Investigations)....35

H.    Under the Privacy Act, Plaintiffs Have a Right of Access to Responsive
Documents in the Possession of the Government.................................................36

    1.     The FBI's Inadequate Privacy Response .....................................................37

    2.     The TSA's Inadequate Privacy Response ....................................................38

VII.    CONCLUSION ....................................................................................................39

**TABLE OF AUTHORITIES**

                                                                                      **Page(s)**

**Cases**

Assembly of The State of California v. U.S. Dept. of Commerce,
        968 F.2d 916 (9th Cir. 1992) ....................................................................23, 26

Audubon Society v. U.S. Forest Service,
        104 F.3d 1201 (10th Cir. 1997) ...................................................................18

Baez v. Dept. of Justice,
        647 F.2d 1328 (D.C. Cir. 1980).....................................................................33

Bay Area Lawyers Alliance for Nuclear Arms Control v. Dept. of State,
        818 F. Supp. 1291 (N.D. Cal. 1992) ......................................................... passim

Berry v. Dept. of Justice,
        733 F.2d 1343 (9th Cir. 1984) ......................................................................31

Billington v. U.S. Dept. of Justice,
        233 F.3d 581 (D.C. Cir. 2000) ......................................................................16

Campbell v. U.S. Dept. of Justice,
        164 F.3d 20 (D.C. Cir. 1998) ..................................................................15, 17

Castaneda v. U.S.,
        757 F.2d 1010 (9th Cir. 1985) ......................................................................33

Church of Scientology of California v. U.S. Dept. of the Army,
        611 F.2d 738 (9th Cir. 1980) ............................................................28, 35, 36

Cox v. U.S. Dept. of Justice,
        576 F.2d 1302 (8th Cir. 1978) ......................................................................18

Crooker v. Bureau of Alcohol, Tobacco and Firearms,
        670 F.2d 1051 (D.C. Cir. 1981).....................................................................18

Department of Air Force v. Rose,
        425 U.S. 352 (1976)............................................................................. passim

Dobronski v. FCC,
        17 F.3d 275 (9th Cir. 1994) .....................................................................28, 29

Don Ray Drive-A-Way Company of California, Inc. v. Skinner,
        785 F.Supp. 198 (D.D.C. 1992) ....................................................................20

Exner v. FBI,
        612 F.2d 1202 (9th Cir. 1980) ......................................................................37

Falwell v. Executive Office of the President,
        158 F. Supp.2d 734 (W.D.Va. 2001) .............................................................38

iii

Ferguson v. Kelley,
   448 F.Supp. 919 (N.D. Ill. 1978) ................................................................. 19, 33

Founding Church of Scientology of Washington, D.C., Inc. v. Smith,
   721 F.2d 828 (D.C. Cir. 1983) ..................................................................... 18, 19

Getman v. NLRB,
   450 F.2d 670 (D.C. Cir. 1971) ................................................................28, 32, 33

Hardy v. Bureau of Alcohol, Tobacco and Firearms,
   631 F.2d 653 (9th Cir. 1980) ............................................................................ 18

In re The Washington Post Co.,
   807 F.2d 383 (4th Cir. 1986) ............................................................................ 39

Iturralde v. Comptroller of the Currency,
   315 F.3d 311 (D.C. Cir. 2003) .......................................................................... 17

John Doe Agency v. John Doe Corp.,
   493 U.S. 146 (1989) ......................................................................................... 12

Kamman v. U.S. Internal Revenue Service,
   56 F.3d 46 (9th Cir. 1995) ............................................................................... 14

Katz v. Dept. of Justice,
   498 F. Supp. 177 (S.D. N.Y. 1979) .................................................................... 19

King v. U.S. Dept. of Justice,
   830 F.2d 210 (D.C. Cir. 1987) .......................................................................... 14

Lesar v. U.S. Dep't of Justice,
   636 F.2d 472 (D.C. Cir. 1980) .......................................................................... 18

Lion Raisins Inc. v. United States Dept. of Agriculture,
   354 F.3d 1072 (9th Cir. 2004) ..................................................................... 12, 25

Maricopa Audubon Society v. U.S. Forest Service,
   108 F.3d 1082 (9th Cir. 1997) ..................................................................... 14, 18

Maricopa Audubon Society v. U.S. Forest Service,
   108 F.3d 1082 (9th Cir. 1997) .......................................................................... 18

Maricopa Audubon Society v. United States Forest Service,
   104 F.3d 2101 (10th Cir. 1997) ......................................................................... 18

National Labor Relations Board v. Sears, Roebuck & Co.,
   421 U.S. 132 (1975) ..........................................................................22, 23, 26, 27

National Labor Relations Board v. Sears, Roebuck & Co.,
   421 U.S. 132 (1975) ......................................................................................... 24

iv

National Wildlife Federation v. United States Forest Serv.,
   861 F.2d 1114 (9th Cir. 1988) ...................................................................27

National Wildlife Federation v. United States Forest Serv.,
   861 F.2d 1114 (9th Cir. 1988) ...................................................................24

Oglesby v. U.S. Dept. of the Army,
   79 F.3d 1172 (D.C. Cir. 1996) ...................................................................15

Paisley v. C.I.A.,
   712 F.2d 686 (D.C.Cir. 1983) ...............................................................23, 27

Paisley v. C.I.A.,
   712 F.2d 686 (D.C.Cir.1983) .....................................................................24

PHE, Inc. v. Department of Justice,
   983 F.2d 248 (D.C. Cir. 1993) ...................................................................12

Pratt v. Webster,
   673 F.2d 408 (D.C.Cir. 1982) ....................................................................35

Public Citizen v. Dept. of Education,
   292 F.Supp.2d 1 (DDC 2003) .....................................................................17

Renegotiation Board v. Grumman Aircraft,
   421 U.S. 168 (1975).....................................................................................23

Rosenfeld v. U.S. State Dept. of Justice,
   57 F.3d 803 (9th Cir. 1995) .....................................................32, 34, 35, 36

Ryan v. Department of Justice,
   617 F.2d 781 (D.C. Cir. 1980) ...................................................................27

Ryan v. Department of Justice,
   617 F.2d 781 (D.C. Cir. 1980) ...................................................................24

Schwaner v. Dept. of the Air Force,
   898 F.2d 793 (D.C. Cir. 1990) ...................................................................18

Shrecker v. U.S. Dept. of Justice,
   254 F.3d 162 (D.C. Cir. 2001) ...................................................................17

Stern v. Richardson,
   367 F.Supp 1316 (D.D.C. 1973) ................................................................18

Strang v. Collyer,
   710 F. Supp. 9 (D.D.C 1989) .....................................................................23

U.S. Dept. of Justice v. Reporters Committee,
   489 U.S. 595 (1989).....................................................................................33

United States Dept. of State v. Washington Post Co.,
    456 U.S. 595 (1982) ...................................................................................29

Van Bourg v. NLRB,
    728 F.2d 1270 (9th Cir. 1984) .....................................................................28

Vaughn v. Rosen,
    523 F.2d 1136 (D.C. Cir. 1975) ...................................................................18

Weisberg v. U.S. Dept. of Justice,
    705 F.2d 1344 (D.C. Cir. 1983) ...................................................................17

Weissman v. Central Intelligence Agency,
    565 F.2d 692 (D.C. Cir. 1977) .....................................................................33

Wiener v. Federal Bureau of Investigation,
    943 F.2d 972 (9th Cir. 1991) ................................................................ passim

**Statutes**

28 C.F.R. § 16.69 ..........................................................................................37

49 C.F.R. § 10.61(a) ......................................................................................38

49 C.F.R. § 10.63 ....................................................................................37, 38

5 U.S.C. § 552 ...................................................................................... passim

5 U.S.C. § 552(b)(5) .....................................................................................24